*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 10a0105p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

BILLY JOE ENGLISH,

        *Petitioner-Appellee,*

     *v.*

KENNETH ROMANOWSKI,

        *Respondent-Appellant.*

No. 08-2611

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 06-11552—Arthur J. Tarnow, District Judge.

Argued: March 11, 2010

Decided and Filed: April 15, 2010

Before: KENNEDY, MOORE, and SUTTON, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Laura G. Moody, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Todd A. Shanker, FEDERAL DEFENDER OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Laura G. Moody, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Todd A. Shanker, James R. Gerometta, FEDERAL DEFENDER OFFICE, Detroit, Michigan, for Appellee.

     KENNEDY, J., delivered the opinion of the court, in which SUTTON, J., joined. MOORE, J. (p. 24), delivered a separate opinion concurring in part and dissenting in part.

———————————

## OPINION

———————————

     KENNEDY, Circuit Judge. Respondent-Appellant Warden Kenneth Romanowski appeals the district court's decision to grant Petitioner-Appellee Billy English conditional habeas relief. The district court found that English was entitled to

habeas relief because his trial counsel rendered him ineffective assistance in violation

of the Sixth Amendment when he failed to call a witness after promising her to the jury,

or alternatively, when he failed to properly investigate the case. For the following

reasons, we REVERSE in part and AFFIRM in part the district court's grant of habeas

relief to English based on his ineffective-assistance-of-counsel claims.

## FACTUAL/PROCEDURAL BACKGROUND

On the night of April 28, 2002, a fight broke out between Petitioner-Appellee

Billy English and one Ronald Higdon in an apartment at 19 Clark Street ("Clark Street

apartment" or "apartment") in Pontiac, Michigan. The fight resulted in Higdon

sustaining multiple stab wounds requiring an ambulance trip to the hospital and over 100

stitches. After a police investigation of the incident, the government charged English

with assault with intent to murder and carrying a concealed weapon. English pleaded

not guilty and proceeded to trial. At trial, the government and the defense presented

substantially different versions of the facts.

## I. Prosecution's Case

The prosecution's theory of the case was that English committed an unprovoked

and violent attack on Higdon. Although the prosecution offered the testimony of

multiple witnesses to support its case,[1] the witness testimony relevant to the issues

before this Court is that of Ronald Higdon, Daniel Lamont, and Kevin Whitehouse.

### A. *Ronald Higdon's Testimony*

Ronald Higdon testified that, in the months leading up to the attack, he had been

living at the Clark Street apartment with his then-girlfriend Lydia Ceruti,[2] Lydia's three

---

[1]The government also solicited the testimony of 1) John Rayner, the paramedic who responded to the fight; 2) Dr. Christina Campbell, the treating physician at the hospital to which Higdon was taken; and 3) Christopher Giolitti, the police officer who responded to the scene after 911 was called.

[2]Since the time of the attack and subsequent criminal trial, Lydia Ceruti has since married Petitioner and now goes by Lydia English. However, to facilitate the recitation of the relevant facts, which primarily took place before Lydia's marriage to English, we refer to her by her maiden name.

children,[3] and one Daniel Lamont, a friend of Higdon who had moved into the apartment when he did. However, on April 28, 2002, the date of the incident, Higdon and Ceurti were no longer involved in an intimate relationship and Higdon was scheduled to move out of the apartment on May 3, 2002. At this time, Higdon was aware not only that Ceruti had recently become romantically involved with English, but also that English was actually the father of Ceruti's youngest child, Brice, who was conceived at a time when Ceruti was cohabitating with Higdon.

At approximately 9:30 p.m., Higdon saw English, Ceruti, and Brice sitting in a car in front of the Clark Street apartment.[4] Higdon went up to the car and had a brief conversation with Ceruti. Higdon then left for a period of time, at which point English, Ceruti, and Brice entered the apartment. Later in the evening, Higdon returned to the area and went up to the apartment. The apartment was the second-floor unit of a two-unit, two-floor apartment building. Two doors needed to be unlocked in order to gain access to the apartment in question. According to Higdon, he used a key to open the first door, then used a standard household butter knife to "jimmy open" the second door. According to Higdon, the lock to this second door was broken and always had to be jimmied open. After Higdon opened these doors and entered the apartment, he noticed that Ceruti and the three children were present along with English, who was sitting on the edge of a pull-out sofa bed that had been opened in the middle of the family room. Daniel Lamont was also present in the apartment at this time. According to Higdon, as he entered the apartment, he immediately placed the butter knife he used to open the second door on the entertainment center in the family room. He then went up to English and started a conversation about the children. At the end of the conversation, Higdon offered to shake hands. English originally refused but then agreed after Higdon asked a second time. Higdon then turned his back to English and walked toward Ceruti, who was standing at or near the door leading out of the apartment. Higdon began talking to

---

[3]Ceruti's children are named Amber, Cody, and Brice. At the time of the fight, their respective ages were six, four, and two years.

[4]Although it was not revealed during Higdon's testimony, Ceruti had left the apartment earlier, along with her son, Brice, after she and Higdon had an altercation in the apartment. *See infra*, at 10-11.

Ceruti, apparently asking her to let him stay for a few extra days. During the conversation, Higdon unexpectedly felt an extreme pain in his lower back that he described as a burning and stinging sensation. He turned around and saw English standing before him with a knife in his hand. Higdon testified that he then grabbed English's hand and threw English against the wall. Just as Higdon was about to get the knife out of English's hand, English pulled out another knife with his other hand and started slashing at Higdon. Higdon was cut multiple times on his face and hands. Higdon also testified that during the fight, English repeatedly said, "I'm going to kill you."

At some point during the altercation, Higdon became weak (apparently from blood loss), released English and went into one of the bedrooms, slammed the door, and leaned his body against the door so that English could not enter the room. Higdon then used a cell phone to call 911. Higdon testified that while he was waiting for the police to arrive, he could hear English on the other side of the door, yelling that "if I open the door or if I come out out of that room, that he's going to give me some more of what I just got . . . that this time he's going to kill me." An ambulance eventually arrived, and Higdon was taken to a nearby hospital for treatment.[5]

*B. Daniel Lamont's Testimony*

Daniel Lamont, who is legally deaf and testified with the aid of a qualified sign language interpreter, essentially corroborated Higdon's testimony. Lamont, a friend of Higdon, was also living in the Clark Street apartment in April 2002 and was present at the apartment when the fight occurred. Lamont testified that Higdon had been at the apartment earlier in the day but had left for a period of time in the evening. While he was gone, the police came to the apartment with Ceruti in search of Higdon but left when they determined that he was not there. Some time after the police had left, Higdon returned to the apartment and noticed English sitting on the pull-out bed. Higdon

---

[5]Higdon's treating doctor at the hospital later testified at trial that Higdon lost a substantial amount of blood, was treated with over 100 stitches, and would have died had he not been treated promptly.

approached English and had a brief conversation with him. Higdon then turned, walked to Ceruti, and began asking if he could stay for a few extra days.[6] Higdon had his hands in his pockets during this conversation. According to Lamont, Higdon did not have a knife on his person. Eventually, English got up, walked over to Higdon, and stabbed him with a knife.[7] Higdon and English then struggled over the knife before English pulled another knife and slashed at Higdon with it. Higdon then escaped to a bedroom, and English stood outside the room, telling Higdon to come out of the room so that they could continue to fight.

Lamont also testified that while Higdon was in the bedroom, English and Ceruti had a brief conversation that ended in Ceruti grabbing a knife from the kitchen and throwing it on the floor near the bedroom where Higdon was hiding. Lamont also claimed that he received threats from both Ceruti and English before trial about his testimony. At the preliminary examination, Lamont testified that Ceruti asked him to change his story. At the trial, Lamont testified that two days after the preliminary examination, Ceruti and English both approached Lamont, accused him of allowing Higdon into the apartment on the night of the fight, attempted to take his keys, and pushed and shoved him. According to Lamont, English eventually said that Lamont was "not worth it" and let him go.

*C. Kevin Whitehouse's Testimony*

Kevin Whitehouse, the third damaging prosecution witness, was Higdon's brother-in-law.[8] Whitehouse was not a witness to the attack. Rather, he testified that he had received a phone call from English some time after the attack, in which English told Whitehouse that he "wish[ed] he would have killed the son of a bitch." Whitehouse also testified that he received threats from Ceruti regarding his expected testimony at

---

[6]Although Lamont is deaf, he testified that he could read lips. In fact, at the preliminary hearing, Lamont testified without the aid of an interpreter by reading the lips of the attorneys.

[7]Although Higdon testified that he was stabbed the first time in the back, Lamont testified that Higdon was struck first in the back of the head.

[8]Whitehouse was married to Higdon's sister. However, some time after English's trial, Whitehouse and Higdon's sister were divorced.

trial.  He claimed that he received at least thirteen phone calls from Ceruti, which included threats that she would send her people to his house, presumably to harm him.

## II.  Defense's Case

The defense's theory of the case was self-defense, and it attempted to present a version of the facts consistent with that theory.  In his opening statement, defense counsel stated to the jury that it would hear from Lydia Ceruti, who would testify that Higdon was attempting to hit her when English attacked him.  However, when the defense actually presented its case, defense counsel did not call Ceruti as a witness.  Instead, English's attorney opted to call only Billy English himself.

### A.  Billy English's Testimony

English testified that at around 5:00 p.m. on April 28, 2002, Ceruti came to his house with her son, Brice, and asked to use English's cell phone to call the police.  After she called the police, English, Ceruti, and Brice drove back to the Clark Street apartment and waited in Ceruti's car for the police to arrive.  While they were waiting, they saw Higdon twice.  The first time, Higdon walked up to the driver side where Ceruti was sitting and asked to talk to her.  When she refused, he left.  Later, Higdon came back to the car and asked English to roll down the window so that Higdon could speak to him.  When he refused, Higdon threatened to "bust . . . out" the window.  English still refused, and Higdon eventually left and went back to the apartment.  The police eventually[9] arrived and escorted Ceruti upstairs to her apartment.  After searching the house and finding that Higdon was no longer there, the police left.  Ceruti then came back to the car and took English and Brice upstairs to the apartment.  Later that night, Higdon entered the apartment unannounced.  Higdon walked up to English and initiated a heated conversation in which Higdon said that English was "lucky [Higdon] don't kill [his] little ass right now."  He also told English to take care of Higdon's house and Higdon's kids.  Higdon then turned around and walked over to Ceruti.  As Higdon was talking to

---

[9]English testified that he and Ceruti had to call the police five times before officers arrived on scene.

her, English saw Higdon pull his hand back as if he was going to hit Ceruti. English then got up to defend Ceruti. As English approached, he saw Higdon reach behind his belt and pull out a knife. English then pulled out a knife of his own and stuck it in Higdon's back. The men then began fighting with each other, and at some point English pulled out a second knife. Higdon eventually withdrew into the apartment and hid in one of the bedrooms. English admitted that he stood by the door of the bedroom and threatened Higdon with more harm if he came out of that room.

## III. Verdict

After hearing closing arguments from the government and the defense, the jury deliberated and convicted English of both counts. English was sentenced to concurrent sentences of eleven years eight months to thirty years in prison for the assault conviction and two to five years in prison for the weapons conviction.

## IV. Post-Trial Proceedings

Following trial, conviction, and sentencing, English filed a motion for new trial and evidentiary hearing in state court pursuant to *People v. Ginther*, 390 Mich. 436 (1973). English made several claims, including that his attorney provided ineffective assistance of counsel for failing to call Ceruti as a witness and for failing to properly investigate the case. In support of these claims, English submitted an affidavit from Ceruti indicating that she had been prepared to testify on behalf of English at trial and would have corroborated his version of the facts. Nevertheless, on August 6, 2003, the trial court denied Defendant's motion.

English then appealed to the Michigan Court of Appeals, raising the same ineffective-assistance-of-counsel claims. On June 10, 2004, the Michigan Court of Appeals affirmed the convictions and denied English's appeal. *People v. English*, No. 247354, 2004 WL 1292789 (Mich. Ct. App. June 10, 2004). In so ruling, it stated the following:

> Defendant says that his trial counsel's performance was deficient because
> he did not call Ceruti despite the fact that during his opening statement,

he stated that he would call Ceruti, who would testify that Higdon broke into the apartment, pulled a knife and threatened her, that defendant pulled a knife in response, and that defendant stabbed Higdon in self defense. Trial counsel's "failure to call witnesses is presumed to be trial strategy." *People v. Mitchell*, 454 Mich. 145, 163; 560 NW2d 600 (1997), citing *Strickland v. Washington*, 466 U.S. 668; 104 S Ct 2052; 80 L.Ed.2d 674 (1984); *Ginther*, *supra*. We agree with the trial court that this testimony is cumulative to defendant's own testimony. Here, the victim, Higdon, testified that defendant attacked him and Lamont's testimony corroborated Higdon's. Furthermore, Lamont testified that after Higdon escaped from defendant, Ceruti placed a knife on the floor near the bedroom in which Higdon hid. Lamont also testified that prior to defendant's preliminary examination, Ceruti asked Lamont to change his story. He further testified that defendant and Ceruti approached him, and accused him of letting Higdon into the apartment. Higdon's brother-in-law, Kevin Whitehouse, testified that defendant told him that he "wished he had killed the son of a bitch [referring to Higdon]," and that Ceruti asked Whitehouse to lie, and threatened him and his family. Defendant himself admitted, while testifying in his own defense, that he was carrying the concealed knives, that Higdon had not hit defendant or Ceruti, and that defendant could easily have walked away from Higdon after he and defendant finished their conversation and Higdon turned to walk away. Defendant also admitted to stabbing Higdon several times. Because of the testimony given by Lamont and Whitehouse, we conclude that trial counsel likely made the decision not to call Ceruti as a witness for strategic reasons. Defendant argues that he was forced to testify because of counsel's failure to call Ceruti. Defendant claims that Ceruti's testimony was not cumulative to his but rather, was testimony of a "neutral" witness, which would have relieved him of the necessity of testifying. However, we reject defendant's argument that Ceruti was an unbiased, neutral witness. We find this argument less than persuasive given Ceruti's failed relationship with Higdon precipitated by her romantic relationship with defendant, together with Lamont's and Whitehouse's testimony of Ceruti's conduct toward them. Accordingly, we hold that defendant has failed to rebut the presumption that trial counsel's decision not to call Ceruti as a witness was sound trial strategy, that defendant has overcome [sic] "strong presumption" that the performance of his trial counsel was sufficient, and that the trial court did not err when it denied defendant's motion for new trial and/or a *Ginther* hearing. *Sabin* (On Second Remand), *supra*.

*Id.* at *2. On February 28, 2005, the Michigan Supreme Court denied English's application for leave to appeal the decision of the Michigan Court of Appeals. *People v. English*, 472 Mich. 866 (2005).

On March 31, 2006, English then filed a federal habeas petition alleging the same ineffective-assistance-of-counsel claims, as well as several other independent grounds for relief. The district court appointed English counsel and eventually held an evidentiary hearing to evaluate the merit of English's claims.

*A. Evidentiary Hearing*

At the March 13, 2008 evidentiary hearing, four persons testified: Billy English, Lydia Ceruti, Elias Escobedo (English's trial attorney), and Kenneth Frazee (the prosecutor who tried the case).

*1) Billy English's Testimony*

English testified that he met his attorney a few times before trial to discuss his case and the trial strategy they would follow. According to English, he provided his attorney at one point with the names of three potential witnesses, including Lydia Ceruti, whose testimony would be beneficial to the defense. English claimed that his attorney told him that he would definitely call Ceruti to testify at trial. It was not until after the defense rested its case that English realized his attorney would not call Ceruti after all. He claimed that his attorney never made any mention of why he did not call Ceruti to testify.

*2) Lydia Ceruti's Testimony*

Lydia Ceruti testified about her recollection of the April 28, 2002 attack, as well as the events leading up to the attack. Ceruti testified that she was the sole lessee named on the rental agreement for the Clark Street apartment. Two or three months before the April 28 incident, Ceruti had ended her relationship with Higdon. Higdon had moved out and Ceruti retained custody of the children, but Higdon did come to the apartment from time to time to talk to Ceruti and see his children.

Ceruti testified that on the day of the incident, Higdon came over to the apartment asking to see his children, and Ceruti let him in. After a period of time, Ceruti asked Higdon to leave, but he refused. Higdon asked if he could stay at the Clark Street

apartment a few extra days because he had nowhere else to go, but Ceruti denied his request. Higdon then grabbed Ceruti by the arm, took her into the bathroom, made her take off all of her clothes, and then told her, "Look at you, you're fat, you're ugly, nobody is going to want you, no one is going to want these kids." Ceruti was eventually able to put her clothes back on and then leave the apartment with her son, Brice. Ceruti lied to Higdon and told him that she was taking Brice over to her mother's house. She did this because "[o]therwise, he would not have let me out." Upon leaving the apartment, she instead went to English's home and asked to use his cell phone to call 911. According to Ceruti, she called 911 because she was "very afraid" of Higdon due to his propensity for violence.[10] After calling 911, Ceruti, English, and Brice went back to the apartment and waited in Ceruti's car for the police to arrive.

Before the police arrived, Higdon came out and approached the car on two separate occasions, making threats to Ceruti and English. At one point, he specifically threatened to break in the windows if they did not unlock the doors and talk to him. Ceruti called the police four additional times before they finally arrived. The police then escorted Ceruti into the apartment and searched for Higdon, who had apparently left the apartment with Ceruti's cell phone, which she had left somewhere in the apartment. The police told Ceruti to call back if Higdon returned, and then they left the scene.

Ceruti came back down to the car and escorted English and Brice up to the apartment. About an hour and a half after the police left, Higdon reappeared at the apartment building and forced his way into the apartment in order to "have a few words with Billy." After speaking to English, Higdon turned and approached Ceruti, again asking her if he could stay a few extra days. She again refused, but while doing so she saw her cell phone in one of Higdon's pockets and attempted to reach for it. Higdon, who was "very agitated," then lifted his hand as if he were going to hit her. Instead of

---

**10**At the hearing, Ceruti also provided detailed testimony about Higdon's history of physical and emotional abuse towards her, as well as his regular drug use. She also testified that English knew about the drug use and Higdon's abusive behavior, both because Ceruti had told English about the abuse and also because he had seen Ceruti on several occasions with bruises on her face and body. However, during the trial, the presiding judge made a ruling, based on the Michigan Rules of Evidence, prohibiting admission of Higdon's history of violence. Notwithstanding that ruling, the court ruled that any abuse by Higdon on the day of the incident was admissible.

hitting her, he grabbed Ceruti by the arm and pulled her into the hallway. English then stood up and approached Higdon. While English approached, Higdon pulled out a "long kitchen knife" that he had concealed "behind his back some place." Higdon and English then began fighting. According to Ceruti, Higdon was trying to cut English and also throw him over the bannister in the hallway. At some point, English also produced two knives which he used during the fight. After "a little while," Higdon ran into one of the bedrooms and called the police using Ceruti's cell phone. According to Ceruti, English never threatened to kill Higdon during the incident.

Ceruti denied ever placing a knife in the hallway near the bedroom in which Higdon hid. She also denied trying to intimidate or influence Daniel Lamont's testimony. She instead claimed that she had asked Lamont to move out of the apartment because he had left a crack pipe under or near the couch and within reach of Ceruti's children. Lamont, who was drunk at the time, violently grabbed Ceruti's hand and forced her to give him back the key to the apartment. At some point after this encounter, Ceruti called the police and reported the incident. At the evidentiary hearing, English's new appointed attorney submitted as evidence a police report which charged Lamont with assault and battery and noted Ceruti's injury from the attack, which included redness and swelling to her right wrist.

Ceruti also denied threatening or offering sexual favors to Kevin Whitehouse. In fact, she claimed that Whitehouse had revealed to her that he wanted English put in jail so that he could have a relationship with her. According to Ceruti, Whitehouse called her on several occasions trying to initiate a relationship, which she refused.

*3) Defense Counsel's Testimony*

English's trial attorney, Elias Escobedo, testified at the evidentiary hearing as to his reasons for not offering Ceruti as a witness. Escobedo provided several reasons as to why he chose not to call Ceruti. First, he was concerned about the threats of violence Ceruti had allegedly made to Lamont and Whitehouse:

> During the course of the trial, there was testimony that was being elicited by a Daniel Lamont. . . . During the course of the trial, Mr. Lamont – the prosecution was questioning him on direct-examination, and Mr. Lamont was going to, at least based on my impression of his testimony at the time, was going to talk about Ms. Ceruti threatening him and – I don't want to say assaulted him, but she was threatening him if he testified. . . . The threats were basically that if [Whitehouse] testified – my interpretation of what he was saying, was that he was going to be injured or that he would be hurt. That Ms. Ceruti was going to send individuals to his home or residence, and that these individuals would hurt him, injure him if he were to testify. . . . My expectation was that if [Ceruti] were called as a witness, there would be testimony that came in, first of all, about the threats that she had made toward Mr. Lamont, as well as – . . . [Whitehouse].

Escobedo also claimed that he did not learn about Ceruti's threats made to Whitehouse until the day of or the day before Whitehouse testified at trial; the transcript does not reflect when he learned of Ceruti's threats toward Lamont.

Second, Escobedo was concerned that Ceruti allegedly offered sexual favors to Whitehouse in return for him changing his testimony. According to Escobedo, "my recollection is he also said that she had offered to have sex with him."[11] Third, Escobedo testified that he was concerned that Ceruti would lie if he allowed her to testify. "[M]y concern was that there would be perjured testimony presented to the Court." Later in the hearing, when asked directly by the district court why he thought Ceruti would commit perjury, Escobedo stated that it was simply based on his experience as a lawyer, as well as "her discussions with me about the events in question and about the threats to the witnesses . . . . I started questioning her, because I became concerned with respect to what was going on outside of the meetings that I was having with her and Billy English with respect to the trial preparation, that I was not aware of . . . ." Escobedo claimed that he did not learn of this problem until after the start of trial, and that he never would have mentioned Ceruti in his opening statement if he had known about it.

---

[11] Although Escobedo made this claim, there is no indication in the trial transcripts that this was presented to the jury.

Finally, Escobedo testified that he was concerned about Lamont's testimony that Ceruti had "planted" a knife by the door of the bedroom where Higdon had hid after the fight. Besides the alleged threats of violence toward Whitehouse, Escobedo was never directly asked when he learned about each potential problem with Ceruti's testimony that concerned him. Escobedo did admit, however, that he had not talked to anyone other than English and Ceruti about the case outside of any discussions in the courthouse during the trial.

### 4) Prosecutor's Testimony

The prosecuting attorney at trial, Kenneth Frazee, also testified at the evidentiary hearing regarding the alleged threats made by Ceruti to witnesses. Frazee testified that Lamont had been threatened by Ceruti as early as a day or two after the April 28 assault took place. He also testified about the threats made to Whitehouse, claiming that they did not occur until after the opening statements in the trial were made. Frazee said that he was not told about the threats until the day Whitehouse was scheduled to testify, and that Frazee told Escobedo about the alleged threats as soon as he was made aware of them himself. Frazee also testified that, had Ceruti testified at trial, he would have brought up these issues during cross-examination in order to impeach her. Frazee did admit, however, that no charges were ever filed against English or Ceruti for the alleged witness tampering.

### B. District Court Decision

On December 9, 2008, the district court conditionally granted English's petition for habeas relief. *English v. Romanowski*, 589 F. Supp. 2d 893 (E.D. Mich. 2008). The court found that English's attorney provided ineffective assistance of counsel in violation of the Sixth Amendment both by failing to call Ceruti as a witness and by failing to investigate and prepare the case properly. With respect to counsel's failure to call Ceruti, the court noted that Ceruti's testimony was not cumulative because she was the only person who would have corroborated English's version of the events. *Id.* at 899. Moreover, the court rejected the state court's finding that this was a sound trial strategy. According to the district court, defense counsel was deficient in allowing the

damaging testimony regarding Ceruti into evidence without calling Ceruti as a witness to refute it. *Id.* at 900. The court also found that the unreasonableness of counsel's failure call Ceruti was "exacerbated" by the fact that he promised Ceruti's testimony to the jury in his opening statement. *Id.* at 901. After finding deficiency in Escobedo's performance, the court then found that the performance prejudiced English because Ceruti's testimony (or, in the alternative, Escobedo's unfulfilled promise) likely could have tipped the scales for at least one juror. *Id.* at 902.

With respect to Escobedo's alleged failure to investigate, the district court found that the final state court decision considered this claim as merely a restatement of English's claim that counsel was ineffective for failing to call Ceruti as a witness. *Id.* at 903. The district court then found that habeas relief was warranted for this claim for the same reasons as those stated above. *Id.* The court also noted that if Escobedo had fully investigated the case beforehand, he would have been able to properly evaluate Ceruti as a witness before promising her testimony to the jury. *Id.*

The court denied English's other claims for relief. English does not cross-appeal those rulings.

## ANALYSIS

When analyzing the district court's conditional grant of habeas relief for two of English's ineffective-assistance-of-counsel claims, we review the court's legal conclusions *de novo* and its factual findings for clear error. *Towns v. Smith*, 395 F.3d 251, 257 (6th Cir. 2005). To the extent that the state court reached English's ineffectiveness claims, the deferential standard of review set forth in section 2254(d) of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies here. AEDPA limits our review in the following way:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
> > 1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established

> Federal law, as determined by the Supreme Court of the
> United States; or
> 2) resulted in a decision that was based on an
> unreasonable determination of the facts in light of the
> evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). The Supreme Court has explained that a state court decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" the result reached by the Supreme Court in that case. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court decision is an "unreasonable application" of existing Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases, but unreasonably applies it to the facts of the particular . . . case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407. "[A]lthough 'clearly established federal law' . . . simply 'refers to the holdings' of the Supreme Court, courts may look to the lower courts of appeals' decisions to inform the analysis of Supreme Court holdings in determining whether a legal principle has been clearly established by the Supreme Court." *Ruelas v. Wolfenbarger*, 580 F.3d 403, 408 (6th Cir. 2009) (citing *Hereford v. Warren*, 536 F.3d 523, 528 (6th Cir. 2008)).

To prevail on his ineffective-assistance-of-counsel claim, English must show that the Michigan Court of Appeals' denial of his claims were contrary to, or an unreasonable application of, the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, counsel's assistance is only constitutionally ineffective if it is both deficient and prejudicial. *Id.* at 687. The Court in *Strickland* explained:

> First, the defendant must show that counsel's performance was deficient.
> This requires showing that counsel made errors so serious that counsel
> was not functioning as the "counsel" guaranteed the defendant by the
> Sixth Amendment. Second, the defendant must show that the deficient

> performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id. Strickland*'s deficiency prong requires proof that defense counsel's trial attorney's representation "fell below an objective standard of reasonableness." *Id.* at 688. When evaluating trial performance, a reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged conduct might be considered sound trial strategy." *Id.* at 689. Under *Strickland*'s prejudice prong, a defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of [the trial] would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690. However, even when making strategic decisions, counsel's conduct must be reasonable. *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000). "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 690-91. The focus in failure-to-investigate claims, then, is the reasonableness of the investigation (or lack thereof). *See Wiggins v. Smith*, 539 U.S. 510, 527 (2003) (focusing on reasonableness of investigation, rather than underlying decision, in context of failure to investigate mitigating evidence for capital sentencing hearing).

**I. Defense Counsel's Failure to Call Lydia Ceruti as a Witness**

With respect to the claim that English's trial attorney was ineffective for failing to call Ceruti as a witness, we hold that the district court erred when it granted English habeas relief. To the extent that English's claim here revolves around defense counsel's

ultimate decision not to call Ceruti, we must limit our review (of this claim) to the actual decision not to call her as a witness. Although there were several good reasons to call Ceruti to the witness stand under the circumstances, we cannot say that it was an unreasonable application of *Strickland* for the state court to find that English failed to rebut the presumption of reasonableness with respect to his attorney's decision here. In its decision denying post-conviction relief, the Michigan Court of Appeals seemingly provided two grounds for its finding. First, it stated that it "agree[d] with the trial court that [Ceruti's] testimony is cumulative to defendant's own testimony." *English*, 2004 WL 1292789, at *2. Second, the court held that the decision was a reasonable trial strategy in light of the fact that 1) Ceruti was not a neutral witness because of her involvement with English and past history with Higdon, and 2) the elicited testimony of Lamont and Whitehouse regarding Ceruti's threats that made her an unattractive choice as a defense witness. *Id.*

We disagree with the state court's first justification for its ruling; Ceruti's testimony can hardly be considered cumulative to English's testimony. Arguably, whether the witness's testimony would have been cumulative goes to prejudice under *Strickland*, not deficiency. But even assuming arguendo that cumulativeness can inform the deficiency analysis, the state court's argument is still contrary to the facts in the record. Although it is true that Ceruti would merely have corroborated English's version of events, the court failed to recognize that the trial was essentially a swearing match, with the prosecution offering the eyewitness testimony of the victim and Daniel Lamont in opposition to English's testimony. Undoubtedly, the testimony of a second person to corroborate the Defendant's version of the events would not have been cumulative, but rather could have critically added to the strength of the defense's case. *See, e.g.*, *Bigelow v. Williams*, 367 F.3d 562, 574-75 (6th Cir. 2004) (finding multiple alibi witnesses not cumulative to defense despite fact that one other witness already testified to same facts); *see also Washington v. Smith*, 219 F.3d 620, 634 (7th Cir. 2000) ("Evidence is cumulative when it 'supports a fact established by existing evidence,' BLACK'S LAW DICTIONARY 577 (7th ed. 1999), but Washington's whereabouts on the day of the robbery was far from established-it was *the* issue in the case.").

The court's second rationale on its own, however, is a reasonable application of *Strickland*. The court noted three significant problems with Ceruti testifying at trial. First, there was testimony at trial that Ceruti tried to influence Lamont's testimony by threatening him with harm if he did not change his story. *English*, 2004 WL 1292789, at *2. Second, there was testimony at trial that Ceruti tried to influence Kevin Whitehouse's testimony, including the allegation that she threatened to send someone to his home to harm him. *Id.* Finally, the court noted that Ceruti would have been subject to substantial impeachment "given Ceruti's failed relationship with Higdon precipitated by her romantic relationship with defendant." *Id.* It is a reasonable trial strategy to conclude that these circumstances made Ceruti a bad witness, and that it would consequently be a bad idea for the defense to associate with this witness by having her testify on its behalf. Accordingly, the state court's decision was a reasonable application of *Strickland*.

Indeed, contrary to the district court's opinion, we think that this conclusion is confirmed by counsel's testimony at the evidentiary hearing. At the hearing, defense counsel provided four distinct reasons for his decision not to call Ceruti as a witness: 1) Lamont's testimony about Ceruti's threats; 2) Whitehouse's testimony about Ceruti's threats; 3) Lamont's testimony that Ceruti planted a knife near Higdon; and 4) counsel's suspicion at trial that Ceruti's story was manufactured and that she would commit perjury if she testified. As noted above, the testimony regarding the threats provides a reasonable basis for counsel's election not to call Ceruti to the witness stand. The remaining rationales provide yet additional bases for finding that it was a reasonable trial strategy not to associate with this witness any more than necessary and to instead rely solely on the testimony of English, whose credibility had not been called into question like Ceruti.

The district court makes much of the fact that many, if not all, of the potential issues with Ceruti's testimony could have been identified by English's attorney before trial commenced and before he promised Ceruti as a witness. But the attorney's failure to investigate is a separate habeas claim, one that is discussed below and should not

affect the analysis of whether the ultimate decision not to call Ceruti was within the wide range of reasonable and adequate professional assistance. The district court also refers to the fact that the adverse testimony regarding Ceruti's alleged threats had already been received by the jury and was likely prejudicing English. According to the court, the only reasonable thing to do once this testimony came out was to have Ceruti testify notwithstanding the risks in order to refute the adverse testimony. While we do not disagree with the district court's position, we note that our concern is not to decide, using hindsight, what we think would have been the *best* approach at trial. Instead, we must only consider if the approach ultimately taken was within "the wide range of reasonable professional assistance" given the circumstances. *Strickland*, 466 U.S. at 689. For the aforementioned reasons, we think that it was.

## II. Defense Counsel's Failure to Properly Investigate

### A. Deficiency

Although defense counsel's ultimate decision not to call Ceruti was not an unreasonable trial strategy, we hold that counsel's failure to adequately investigate that decision before trial was deficient performance sufficient to satisfy the first prong of the *Strickland* test. As a preliminary note, the state court of appeals did not separately address this specific issue and instead stated that it was merely a "reiterat[ion of English's] argument that trial counsel erred in not calling Ceruti as a witness." *English*, 2004 WL 1292789, at *2 n.3. We find this issue to be distinct (albeit related) from the failure to call Ceruti as a witness and thus afford no deference to the state court opinion as to this issue. But even if we were to impute the state court's analysis of the decision not to call Ceruti to this issue and then apply AEDPA deference, we would still find that English can satisfy the deficiency prong for this claim. For it was objectively unreasonable for English's trial attorney to decide before trial to call Ceruti as a witness, make that promise to the jury, and then later abandon that strategy, all without having fully investigated Ceruti and her story prior to opening statements. This is not a case where counsel simply failed to pursue a potential witness whose testimony could have significantly benefitted his client. Here, counsel was actually prepared to call Ceruti as

a witness.  The deficiency instead was in English's attorney being "'ill equipped to assess [Ceruti's] credibility or persuasiveness as a witness,' or to evaluate and weigh the risks and benefits of putting [her] on the stand" at the time when he made the decisions affecting his trial strategy.  *See Towns*, 395 F.3d at 260 (quoting *Bryant v. Scott*, 28 F.3d 1411, 1419 (5th Cir. 1994)).  To the extent that counsel was in fact concerned about the aforementioned problems with Ceruti's putative testimony, he could have and should have discovered those problems before trial and then evaluated them before he decided whether or not to call (or even promise) the witness at trial.  Conducting a simple pre-trial interview of the other expected witnesses in the case would have exposed at least some of the witness-tampering allegations and would also have allowed English's attorney to test Ceruti's story to see if she was being truthful.  *See id.* at 258 (noting that the duty to investigate "includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence").  Yet English's attorney admitted that he failed to interview any of the witnesses outside of the courthouse or prior to trial.  Counsel could not have developed a reasonable trial strategy since he based his decisionmaking on "what counsel guess[ed the witnesses] might say in the absence of a full investigation," and not "on what investigation reveals witnesses will actually testify to."  *Ramonez v. Berghuis*, 490 F.3d 482, 489 (6th Cir. 2007).

Nor could counsel have made a "reasoned professional judgment that such investigation was unnecessary."  *Towns*, 395 F.3d at 260; *see also Strickland*, 466 U.S. at 691 (noting that counsel must at least "make a reasonable decision that makes particular investigations unnecessary").  Counsel simply had no reason to believe that an investigation was unnecessary, and he owed a duty at least to investigate other witnesses to see what they would claim at trial.  *Towns*, 395 F.3d at 258.  Such an investigation here would have uncovered before trial exactly what counsel later relied upon during trial to make his ultimate decision not to call Ceruti.[12]  Furthermore, a

---

[12]The record does seem to suggest that the threats made by Ceruti toward Whitehouse did not occur until after the commencement of trial.  However, defense counsel never claimed that he knew about the other problems with Ceruti and then changed his mind only after he learned of the threats she made to Whitehouse.  A different outcome might be appropriate under such circumstances, but that case is not before this Court.

simple review of the preliminary hearing transcript would have revealed the majority of concerns on which counsel later based his decision. The transcript includes the very testimony of Lamont that calls into question Ceruti's story, and it includes Lamont's version of the threats Ceruti allegedly made as well as the allegation that she planted the knife. By failing to make these simple investigations before trial, counsel violated his duty to investigate and was thus objectively unreasonable in his performance.

## B. Prejudice

Having found that counsel's performance was deficient, we proceed to the second *Strickland* prong to determine whether the deficient performance prejudiced English. The Michigan Court of Appeals never reached this part of the analysis; consequently, we consider it *de novo*. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) ("Because the state courts found the representation adequate, they never reached the issue of prejudice . . . and so we examine this element of the *Strickland* claim *de novo* . . . ."). Based on our review of the record, we agree with the district court that but for counsel's ineffectiveness, there is a reasonable probability that the outcome would have been different. As defense counsel himself noted at the evidentiary hearing, had he learned of Ceruti's problems as a witness before trial, he never would have promised Ceruti in his opening statement. There were at least three probable consequences of that decision that prejudiced defendant. First, the unfulfilled promise created a negative inference against English generally. As the First Circuit has noted, "little is more damaging than to fail to produce important evidence that had been promised in an opening." *Anderson v. Butler*, 858 F.2d 16, 17 (1st Cir. 1988). The jury in this case must have wondered what happened to Ceruti after she was promised as a corroborating witness for English's story, and the jury may well have counted this unfulfilled promise against English and his attorney. *See United States ex rel. Hampton v. Leibach*, 347 F.3d 219, 259 (7th Cir. 2003) (finding unfulfilled promise by defense counsel in opening caused prejudicial negative inference as to defendant and defense counsel's credibility). Second, counsel's deficiency likely caused a negative inference against English's own testimony. English's theory of the incident was the very same version of events that the

jury was told would be corroborated by Ceruti but never received. Thus, any negative inference would also have specifically damaged the credibility of English's version of events (and not just the credibility of English generally). Finally, English was prejudiced by the inflammatory testimony relating to Ceruti that was presented during trial. The record strongly suggests that the state trial judge never would have admitted the otherwise inadmissible testimony regarding Ceruti's witness tampering and alleged false evidence planting if she had not been identified by defense counsel as a potential witness. Instead, because Ceruti was going to be a material witness, the jury was allowed to hear damaging testimony about Ceruti's actions that likely reflected negatively on English due to his association with her.

Moreover, the actual evidence of English's guilt in this case is not overwhelming. The government presented no physical evidence other than the knives that Defendant admitted to possessing and using. Additionally, the government presented no unbiased witnesses[13] as to the issue of self-defense in this case that ultimately boiled down to a swearing match between Higdon and English. Higdon's potential bias is obvious considering his past relationship with Ceruti and Ceruti's current relationship with English. Lamont, meanwhile, was a friend of Higdon and had been living with him at the Clark Street apartment. Finally, Whitehouse was Higdon's brother-in-law at the time of trial. "All it would have taken is for 'one juror [to] have struck a different balance' between the competing stories." *Ramonez*, 490 F.3d at 491 (citing *Wiggins*, 539 U.S. at 537). And in this case, the lack of overwhelming evidence of guilt, combined with the negative consequences of defense counsel's failure to conduct a sufficient pre-trial investigation, sufficiently creates a reasonable probability that at least one juror would have struck a different balance had defense counsel not performed deficiently. Accordingly, we hold that English has also satisfied *Strickland*'s prejudice prong with respect to his failure-to-investigate claim.

---

[13]As noted in the recitation of facts, the government did present neutral witnesses in the form of the officer and paramedic who responded to the scene, as well as the treating physician from the hospital to which Higdon was taken. But none of these witnesses actually saw the fight itself, and none of their testimony was relevant to the ultimate issue of whether English was acting in self-defense.

## CONCLUSION

For the foregoing reasons, we REVERSE in part and AFFIRM in part the district court's conditional grant of habeas relief to Petitioner-Appellee Billy English.

---

## CONCURRING IN PART AND DISSENTING IN PART

---

KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part.  I concur in Part II of the Analysis section of the opinion concerning defense counsel's ineffective assistance in failing to investigate.  However, I disagree with the reasoning in Part I of the Analysis section that English's decision-based ineffective-assistance-of-counsel claim should consider only those circumstances that became known to defense counsel after the first witness was called at trial.  The *Strickland* test requires this court "to engage in the circumstance-specific reasonableness inquiry"—"'the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.'" *Roe v. Flores-Ortega*, 528 U.S. 470, 478 (2000) (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).  I believe that we should not restrict what informs our "objective standard of reasonableness" calculus in a way that removes from consideration the information that defense counsel already possessed and the strategic decisions already made—the decision to stress in his opening statement that Ceruti would testify, which opened the door for the prosecutor to introduce evidence to impeach Ceruti in his case-in-chief.  Considering these circumstances, I believe that defense counsel's decision not to call Ceruti could not become reasonably sound trial strategy.  The reasonableness of defense counsel's later decision to abandon his promise to call Ceruti is affected by his prior strategic decision to make the promise at all, irrespective of his prior investigation.  I therefore respectfully join only the reasoning in Part II of the Analysis section, and I join the judgment insofar as it affirms the district court's conditional grant of a writ of habeas corpus.