NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0454n.06

No. 16-5737

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| ALISHA J. GLISSON, | ) | **FILED** |
| | ) | Aug 03, 2017 |
| Petitioner-Appellant, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| DEBRA K. JOHNSON, Warden, | ) | COURT FOR THE MIDDLE |
| | ) | DISTRICT OF TENNESSEE |
| Respondent-Appellee. | ) | |
| | ) | |
| | ) | |

Before: GUY, ROGERS, KETHLEDGE, Circuit Judges.

KETHLEDGE, Circuit Judge. In 2006, a Tennessee jury convicted Alisha Glisson of felony murder and other crimes for her role in a robbery gone wrong. After the Tennessee courts affirmed her conviction and denied her motion for post-conviction relief, she filed a petition for habeas corpus in federal court. The district court denied her petition. We affirm.

I.

A.

Glisson was living in Nashville, Tennessee when she started dating David Sullivan, a private in the Army who was stationed about an hour away. Sullivan asked Glisson about any drug dealers that she knew, and she told him about a local marijuana dealer named Randy St. Laurent. After Glisson and Sullivan had dated for a couple of weeks, Sullivan and his friend from the Army, Andrew Warner, decided to come to Nashville to rob St. Laurent and beat him up. The two men drove into town and went to Glisson's apartment, where they joined Glisson

and a man named Michael Henry. Glisson told the men that she was planning to spend the evening out partying with St. Laurent. A rough plan soon formed: the men would try to steal money and drugs from St. Laurent's home while he was out with Glisson. Glisson told the men where St. Laurent lived, and the men drove to a nearby motel to complete their plans.

The men drove from the motel to St. Laurent's apartment building, where they entered the wrong apartment at first. They quickly realized their mistake—the apartment was home to a family with two kids, not a drug dealer—and left. Henry called Glisson to confirm St. Laurent's address, and she gave him the correct apartment number. They then knocked on the door to the right place. As St. Laurent's pregnant girlfriend opened the door, the men drew guns on her and barged in, searching the place for drugs and money. They stole about a pound of marijuana, some jewelry, and around $1,500 in cash—much less than they had hoped for. Then the men returned to the motel to plan their next steps and make a few phone calls. They decided to steal whatever St. Laurent had with him, and they drove to Glisson's apartment to wait for him.

Meanwhile, Glisson left St. Laurent and drove around in a different car with another young woman, Meredith Runion. Glisson drove Runion to a hotel parking lot and then back to Glisson's apartment. St. Laurent soon came by to pick up Runion and go back out partying. He pulled up to Glisson's building in his limousine and stepped out of the car. All of a sudden, Henry, Warner, and Sullivan rushed at him. Warner used a stun gun on St. Laurent, who fell back into the limo. As Warner and Henry tried to pull him out of the car, St. Laurent fought back. In the struggle, Henry hit St. Laurent with a gun. The gun accidentally discharged, shooting St. Laurent. The robbers fled, and St. Laurent later died from the gunshot wound.

Detective Danny Satterfield of the Nashville Police Department soon arrived at the scene, where he interviewed several witnesses, including Glisson, who had been in her apartment

during the attempted robbery. Glisson told Satterfield that she had been out partying with St. Laurent that night, but she did not provide any other useful leads. A few months later, Satterfield spoke with Glisson again at the police station. In that videotaped interview, Glisson told her version of what had happened that night. She told the officers, for the first time, about Henry, Sullivan, and Warner. She explained that the men, while at her apartment, had formed a plan to steal drugs from St. Laurent's home. She admitted that she knew about the plan. And she remembered trying to meet up with Henry at a motel at some point after the men had invaded St. Laurent's apartment and walked away unsatisfied. She also claimed she did not know that Henry, Sullivan, and Warner had killed St. Laurent. Instead, she said, "I just know that they were going to rob him, and that, since they did not get all his weed at his house, that they thought that he had it on him or had money on him or whatever."

During the interview, the police officers showed her some phone records, which seemingly proved that she had called the men that night and talked to them repeatedly before St. Laurent's death. Faced with these records, she admitted to being in phone contact with the men throughout the night. But she could not remember what she had said on those phone calls, because she had been "really messed up"—presumably from the drugs and alcohol that she had consumed. The officers asked her if she had called the men to tell them where St. Laurent would be later that night. She said "I do not remember saying 'hey Randy's on his way, come and get him.' I promise you that." But she backtracked later in the interview, admitting that she "may have" talked to Henry about finding St. Laurent after the men "did the home invasion" of St. Laurent's apartment, and that she "may have called" the men after she got home to let them know that she was there. Upon further questioning, she eventually said, "I don't remember, but I know that I did . . . call him [St. Laurent] and say, 'hey are you coming' and then call them [the

men] and said 'hey, he's coming.'" She knew she had done so, she explained, because of the phone records that the police had shown her.

Based on these statements, the police investigated Sullivan, Warner, and Henry. Eventually, the three men and Glisson were all indicted for the murder of St. Laurent. Sullivan promptly pled guilty to second-degree murder and was sentenced to 20 years' imprisonment. During Sullivan's plea hearing, the State read its version of the facts into the record, establishing that Sullivan, Warner, Henry, and Glisson had conspired together to rob St. Laurent's apartment and, later, to ambush St. Laurent outside of Glisson's apartment. Sullivan stated under oath that the State's recitation of those facts was true.

Although the State offered Glisson a plea deal for 15 years' imprisonment, she refused and prepared to go to trial. Her counsel hired a private investigator to help prepare her case. The defense soon learned that the prosecution planned to call Warner and Henry to testify against Glisson, but not Sullivan. Glisson talked to her counsel about calling Sullivan to testify in her defense, but counsel ultimately decided that she would neither interview him nor call him as a witness. Glisson trusted her lawyer's judgment.

B.

At trial, the prosecution started by calling Henry and Warner as witnesses. According to Henry, Glisson was involved in the plan to rob St. Laurent from the beginning; he testified that she had talked to him about the plan before the other men had arrived and that, after Sullivan and Warner had joined them, they all discussed the plan and decided to split any profits four ways. Henry said that Glisson was the one who had told them how to get to St. Laurent's building.

Henry also testified about several phone calls that he had exchanged with Glisson. First, he called her to ask about which apartment was St. Laurent's after the men had gone into the

wrong one, and she told him the right apartment number. Second, he said that he called her from the motel after the failed home invasion, "[t]rying to find out if [St. Laurent] really had . . . that stuff and if he had it on him, [and,] you know, where we could find him at." She apparently responded that she did not know, but she had "seen the stuff, you know, earlier[,]" and that "[e]veryone was just out riding around." Third, Henry said that he talked to Glisson after she had come home, and that she told them that St. Laurent "was going to end up back over at her place." Finally, Henry said that he had been on the phone with Glisson right around the time when St. Laurent pulled up in his limo. Henry recounted the following conversation for the jury: "She started telling us, you know, don't do it, and [I responded that] we already came this far, it's right here, just get the money and leave[.] . . . And she said, well, she didn't want no part of it[.]" Later Henry added that she also said "well, if you're going to go ahead and do it . . . don't do it here[.]"

Warner testified next and confirmed several points of Henry's story, including that Glisson was going to get some of the money from the robbery; that Henry had called someone after the men had gone into the wrong apartment; that Henry (and Sullivan) had made phone calls from the motel; and that "somebody ma[d]e a phone call that caused" the men to leave the motel. According to Warner, the men thereafter went straight to Glisson's apartment to wait for St. Laurent.

The State called several other witnesses, including Meredith Runion, Courtney Perry (St. Laurent's girlfriend), and Detective Satterfield. And the State played the entire recording of Glisson's videotaped interview for the jury. (The trial court excluded all evidence of the content of the phone records because they had not been authenticated, but it permitted the jury to hear the

videotape in full despite the officers' and Glisson's references to those records.) The defense did not present any witnesses.

C.

The jury ultimately convicted Glisson on all counts and the trial court sentenced her to a mandatory term of life imprisonment for felony murder. Glisson appealed, arguing only that there was insufficient evidence to convict her. The Tennessee Court of Criminal Appeals affirmed her conviction on the merits, and the Tennessee Supreme Court denied review. *State v. Glisson*, No. M2006-02115-CCA-R3-CD, 2008 WL 624929, at *1 (Tenn. Crim. App. Mar. 5, 2008), *perm. app. denied* (Tenn. Aug. 25, 2008) (*Glisson I*).

Glisson thereafter filed a state motion for post-conviction relief, again arguing that the evidence against her was insufficient and adding a claim that her trial counsel had been ineffective when she had failed to interview Sullivan or call him as a witness. At a hearing on the post-conviction motion, Sullivan testified that the entire robbery had been his idea and that he had manipulated the others into going along with it. Specifically, he said that he had tricked Glisson into thinking he just wanted to buy drugs from St. Laurent—"At the time," he said, "it wasn't about a robbery, it was about a drug deal. I turned it into a robbery." Glisson also testified, explaining that she had talked to her counsel before trial about getting Sullivan to testify and that she thought Sullivan would "take responsibility" for what had happened.

In response, the State called Glisson's counsel, Cynthia Fort, to testify. Fort explained that she had worked with a private investigator to look into Sullivan's background, which, as Fort told Glisson, made Sullivan seem like a "thug." Fort also asked the investigator to look into Sullivan's plea deal, because she was suspicious of Sullivan's motives for pleading guilty so quickly. The investigator discovered that Sullivan had negotiated the plea under pressure, in

-6-

connection with another case against him for an offense he had committed while he was AWOL from the Army. Fort testified that she knew Sullivan's plea was not necessarily in his best interests, and that any facts read into the record by the State during Sullivan's plea proceedings would have "implicated not only himself but Ms. Glisson[.]" Fort also spoke with Sullivan's attorney. Ultimately, Fort concluded that her defense strategy had to be to "separate [Glisson] as much as we could from the three bad guys"—including Sullivan.

The Tennessee trial court denied Glisson's motion for post-conviction relief, the Court of Criminal Appeals affirmed, and the Tennessee Supreme Court denied review. *Glisson v. State*, No. M2010-01483-CCA-R3-PC, 2011 WL 3841971, at *1 (Tenn. Crim. App. Aug. 30, 2011), *perm. app. denied* (Tenn. Jan. 13, 2012) (*Glisson II*). Glisson thereafter filed this federal habeas petition, which the district court denied. This appeal followed.

## II.

We review de novo the district court's denial of a habeas petition. *Barton v. Warden, S. Ohio Corr. Facility*, 786 F.3d 450, 460 (6th Cir. 2015).

## A.

Glisson argues that her conviction violated her due-process rights because the prosecution did not prove that she was guilty of felony murder beyond a reasonable doubt. To succeed on this claim, Glisson must overcome "two layers of judicial deference": one to the state court that ultimately rejected her argument on the merits, and one to the jury that convicted her. *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per curiam). We must uphold the Tennessee court's decision on the merits unless the court's adjudication of her claim was objectively unreasonable. *Id.* And we must uphold the jury's conviction if, "after viewing the evidence in the light most favorable to the prosecution," we find that "*any* rational trier of fact could have

found the essential elements of the crime beyond a reasonable doubt." *Id.* at 2064 (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

To convict Glisson of felony murder under Tennessee law, the jurors had to find that Glisson was criminally responsible for the "killing of another committed in the perpetration of" a felony—here, attempted aggravated robbery—and that she had the intent necessary to commit the underlying felony. *See* Tenn. Code. Ann. § 39-13-202(a)-(b); *Glisson I*, 2008 WL 624929, at *6. Glisson was criminally responsible for the attempted robbery here only if she "solicit[ed], direct[ed], aid[ed], or attempt[ed] to aid" the three perpetrators in the attempted robbery and did so "with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense." Tenn. Code Ann. § 39-11-402(2).

Glisson contends that no reasonable juror or jurist could have concluded, based on the evidence at trial, that she possessed the criminal intent necessary to be criminally responsible for the men's botched robbery of St. Laurent outside her apartment (as opposed to the earlier robbery of St. Laurent's apartment). But Glisson overlooks that jurors may "draw reasonable inferences from basic facts to ultimate facts." *Coleman*, 132 S. Ct. at 2064 (citation omitted). Here, the jury could have reasonably done exactly that. The most basic facts in this case came from Glisson's own statements in her videotaped interview. She expressly admitted to knowing that the men were going to go to St. Laurent's apartment to try to steal drugs from him. She also acknowledged that she may have spoken with the men on the phone throughout the evening, including after the unsuccessful home invasion. And she remembered driving to a motel looking for Henry late in the evening. A jury could reasonably infer from these admissions that Glisson was involved in the venture from beginning to end and that she deliberately helped the men by calling them on the phone to keep them apprised of St. Laurent's whereabouts.

Those inferences were even more reasonable after the jury heard from various other witnesses. Meredith Runion—another woman who had been driving around with St. Laurent that night—testified that she and Glisson had together left St. Laurent and that Glisson had driven her to a hotel for no apparent reason. Meanwhile, Henry and Warner testified that Glisson had helped plan the robbery of St. Laurent's apartment and that she was going to get a cut of any proceeds from it. The men also testified about Henry's various phone calls throughout the evening. Some of those calls—particularly the ones that Henry described as taking place after the unsuccessful home invasion—could allow a jury to infer that Glisson knew about the change in the men's plans and had helped them by telling them that St. Laurent was going to be at her apartment. A jury could also infer that Glisson had helped the men from the very fact that they knew to wait for St. Laurent outside her apartment. All of these facts, taken together, justified both the jury's conviction and the Tennessee courts' denial of Glisson's insufficiency claim.

Glisson makes two arguments in response. First, she says that no reasonable juror could have convicted her because she told Henry that she wanted no part of the robbery of St. Laurent's person and had told him "[d]on't do it." But the call in which Glisson told Henry not to "do it" came well after the men were already positioned outside of her apartment; Henry testified that he was talking to Glisson right as St. Laurent arrived. Hence a jury could have concluded that Glisson had already called the men to tell them that St. Laurent was coming to the apartment and that Glisson's attempt to talk them out of it was too little too late: at the moment she aided the men with the intent that they commit the aggravated robbery, she became criminally responsible for their attempt. *See* Tenn. Code Ann. §§ 39-11-402(2), 39-12-101(a)(2), (3). And once criminally responsible, she could withdraw only by "prevent[ing] the successful commission of the offense" and making a "complete and voluntary renunciation of the" group's

criminal purpose. *Id.* at § 39-12-104. The Tennessee courts reasonably rejected her argument that she had renounced the attempt by making a single, belated plea not to rob St. Laurent—or at least not to do it outside of her apartment. *See Glisson I*, 2008 WL 624929, at *8. Moreover, a jury could have disbelieved Henry's testimony or concluded that Glisson's attempted withdrawal was itself evidence that she had known what was about to happen. And a jury could infer from that knowledge, along with the help she provided to the men, that she intended to and actually did aid them in their attempted robbery. That she thereafter had a change of heart does not negate her criminal responsibility for aiding the attempted aggravated robbery here.

Second, Glisson asserts that the State lacked sufficient evidence because it relied solely on the testimony of Warner and Henry. In Tennessee, as a matter of common law, "a conviction may not be based solely on the uncorroborated testimony of an accomplice." *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001). But when the Tennessee courts say "solely," they mean it: even the existence of "slight circumstances" that "tend to connect the defendant with the commission of the crime charged" is enough to corroborate an accomplice's testimony. *See State v. Griffis*, 964 S.W.2d 577, 588-89 (Tenn. Crim. App. 1997). And that slight evidence is enough even if it would "not be adequate, in and of itself, to support a conviction" and does not "extend to every part" of the accomplice's testimony. *Shaw*, 37 S.W.3d at 903 (citation omitted).

The State disputes whether this rule applies at all to a federal constitutional claim in a habeas petition because, it asserts, "the Constitution says nothing about accomplice testimony and even uncorroborated accomplice testimony is constitutionally sufficient to support a conviction." State Br. at 43. We need not resolve this dispute, however, because Glisson's argument fails on its own terms. As shown above, Glisson's videotaped interview confirmed portions of Warner's and Henry's testimony about her involvement. Moreover, both Runion and

Glisson testified to a fact linking Glisson to the men's crime: Glisson's attempt to find Henry at the motel. Runion's and Glisson's statements were "entirely independent" of Henry's and Warner's testimony and could "lead[] to the inference, not only that a crime [was] committed, but also that the defendant [was] implicated in it." *Shaw*, 37 S.W.3d at 903 (citation omitted). The Tennessee Criminal Court of Appeals was therefore reasonable in concluding that the accomplices' testimony was corroborated and that their statements, combined with Glisson's videotaped interview, provided the jury with enough evidence to convict Glisson as an "active participant in the attempted robbery" who was "accountable for all consequences flowing from" the crime. *Glisson I*, 2008 WL 624929, at *8 (quoting *State v. Hinton*, S.W.3d 113, 119 (Tenn. Crim. App. 2000)).

### B.

Glisson also argues that she is entitled to habeas relief because, she says, her trial lawyer, Cynthia Fort, was ineffective when she failed to interview David Sullivan while preparing Glisson's defense. Although Glisson presented this argument to the Tennessee Court of Criminal Appeals in her motion for post-conviction relief, the parties dispute whether the state court actually addressed the argument in its decision. *See Glisson II*, 2011 WL 3841971, at *5. According to Glisson, the state court did not "separately address this specific issue" and we should therefore "afford no deference to the state court opinion" on that point. *See English v. Romanowski*, 602 F.3d 714, 728 (6th Cir. 2010). But we need not resolve this dispute because, whether we review the issue deferentially or de novo, the outcome here is the same.

To make out a claim for ineffective assistance of counsel, Glisson must show that her counsel's assistance was defective, *i.e.*, that it "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland v. Washington*,

466 U.S. 668, 688 (1984)).  Generally, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Id.* (citation omitted).  But a lawyer's "strategic choices"—even those "made after less than complete investigation"—are reasonable "precisely to the extent that reasonable professional judgments support the limitations on investigation."  *Strickland*, 466 U.S. at 690-91.  When we examine "a particular decision not to investigate" for reasonableness, we must apply "a heavy measure of deference to counsel's judgments."  *Id.* at 691.

Before Glisson's trial, Fort investigated Sullivan and then made strategic decisions not to interview him or to call him as a witness.  Fort hired a private investigator to look into Sullivan's background and the reasons behind his quick guilty plea.  This investigation uncovered "a lot" of information about Sullivan, and made Fort worry about his potential testimony and his impression on the jury as a "thug."  Fort later spoke to Sullivan's lawyer, albeit briefly.  She also spoke to Glisson herself about what Sullivan might say if interviewed.  *See id.*  And perhaps most important, Fort learned that, during Sullivan's plea hearing, he had agreed under oath that Glisson was a full-fledged conspirator in the crime.  Fort therefore knew that, even if she called Sullivan as a witness and he testified more favorably to Glisson, the State could readily impeach him.  Hence Fort's investigation was constitutionally adequate.

Glisson counters with three cases that she says require attorneys always to interview—rather than investigate—potential witnesses like Sullivan.  But those cases stand for more limited propositions.  In one case, counsel was deficient when he "simply decided not to call" or interview a witness despite acknowledging a "need to do so."  *Towns v. Smith*, 395 F.3d 251, 259 (6th Cir. 2005).  In another case, counsel told the jury he would call a particular witness and then did not, all without having adequately investigated or interviewed the witness.  *English*, 602 F.3d

at 728-29. In the third case, counsel "plainly did not" make a "tactical decision" of any sort in choosing not to call or interview a putative alibi witness. *Griffin v. Warden, Md. Corr. Adjustment Ctr.*, 970 F.2d 1355, 1358-59 (4th Cir. 1992). None of these cases, therefore, involved the sort of investigation and strategic judgment that Fort engaged in here. Indeed, Glisson concedes that she is unaware of any federal appellate case in which the court deemed counsel ineffective for choosing not to interview a witness who had already testified under oath about the relevant facts. Thus her claim is without merit.

\* \* \*

The district court's judgment is affirmed.