**Darrick SMITH, Petitioner**

v.

**UNITED STATES of America, Respondent.**

**Case Nos. 3:10CR6, 3:12CV1964.**

United States District Court, N.D. Ohio, Western Division.

Oct. 22, 2013.

Amy B. Cleary, Office of the Federal Public Defender, Cleveland, OH, Andrew P. Hart, Office of the Federal Public Defender, Toledo, OH, for Petitioner.

Matthew C. Spaulding, Thomas P. Weldon, Office of the U.S. Attorney, Toledo, OH, for Respondent.

## ORDER

JAMES G. CARR, Senior District Judge.

In 2010, a jury convicted petitioner Darrick Smith of being a felon in possession of a firearm, and I sentenced him to sixty-three months' imprisonment. Petitioner now seeks relief under 28 U.S.C. § 2255, alleging trial counsel was ineffective and the government's closing argument was improper. (Doc. 72).

For the following reasons, I grant petitioner's § 2255 motion in part and deny it in part.

### Background

#### A. Trial

Officer Eric Board of the Toledo Police Department (TPD) testified that, on September 20, 2009, he and his partner, Officer Charles LeRoux, responded to a 911 call about men gambling near 1547 Woodland Avenue in Toledo, Ohio.

When the officers arrived on the scene, Board saw "a vacant lot with a picnic table" around which several men were seated. (Doc. 63 at 36). He and LeRoux approached the picnic table and told everyone not to move.

Despite this command, one of the men—whom Officer Board identified as petition-

er—started walking toward a house located immediately to the west of the vacant lot. When Officer LeRoux yelled at petitioner to halt, petitioner ran onto the house's enclosed porch. Officer LeRoux gave chase, and Officer Board remained at the picnic table, where the other suspects still sat.

The government's next witness, Officer LeRoux, testified he went to 1547 Woodland Avenue in response to a drug and gambling complaint. At the scene LeRoux saw "a group of males at a picnic table on the sidewalk playing cards." (*Id.* at 48). He also noticed dice on the table.

Officer LeRoux testified that, after he and Officer Board told the men not to move, petitioner began walking toward the house at 1547 Woodland, "holding his hand on his right pocket." (*Id.* at 50). The officers ordered petitioner to stop, but petitioner said he needed to use the bathroom and continued walking toward the house. Officer LeRoux again ordered petitioner to halt, at which point petitioner started running.

LeRoux followed petitioner onto the porch, which was crowded with "boxes and different materials," but he did not see petitioner. (*Id.* at 70–71). As he prepared to enter the house, Officer LeRoux noticed petitioner crouching in a corner with a "metallic" object in his right hand. (*Id.* at 53). LeRoux thought it was a gun, but he was not certain.

Officer LeRoux drew his own gun and ordered petitioner to drop the object in his hand. Petitioner made a "throwing motion," after which LeRoux "heard a thud." (*Id.* at 53, 55). Petitioner then placed his left hand in his pants pocket and ignored LeRoux's order to show his hands. The

officer holstered his weapon, grabbed petitioner, and forced him to the ground. While Officer LeRoux was doing so, he saw petitioner toss some plastic bags behind him.

Immediately after subduing petitioner, Officer LeRoux directed TPD Officer Scott Bailey, who in the meantime had arrived with other officers, to search the area where petitioner had been crouching. Bailey did so and discovered a gun and plastic bags containing what appeared to be marijuana and cocaine.[1]

Later that day, Officer LeRoux learned there was an outstanding arrest warrant for petitioner. LeRoux agreed with defense counsel's suggestion that petitioner may have fled from police because of the warrant.

Officer Bailey testified he "respond[ed] to the area of 1547 Woodland Avenue" because of a "drug, gambling complaint." (Doc. 63 at 78). Bailey saw Officer LeRoux following petitioner as petitioner walked toward the house at 1547 Woodland. When petitioner started running, Officer Bailey also gave chase.

Bailey entered the porch and saw Officer LeRoux struggling to subdue petitioner. When petitioner disregarded Bailey's order to remain still, he "delivered a couple of open hand stuns to the rear of [petitioner's] head," and the officers subdued him. (*Id.* at 81).

At LeRoux's direction, Officer Bailey searched the area where petitioner had been crouching. As LeRoux had testified, Bailey found a semi-automatic pistol and several plastic bags.

TPD Sergeant Joe Heffernan interviewed petitioner after his arrest. Asked why he had run from police, petitioner said

---

**1.** Forensic testing established the bags contained 1.05 grams of crack cocaine and 3.78 grams of marijuana.

"he had a warrant for his arrest, and that's why he was running." (*Id.* at 95). When Heffernan asked about the gun and drugs, petitioner denied they were his.

Terry Taylor testified he owned the home at 1547 Woodland Avenue. On the day of petitioner's arrest, he was sitting at a picnic table "in a lot next to [his] house," drinking beer and socializing with friends. (*Id.* at 104). Taylor was also playing "a little card game," but no one was using drugs. (*Id.* at 108). Taylor denied owning the gun found on his porch.

TPD Detective William Goetz examined the gun for fingerprints. Goetz suspected that any fingerprints would likely have dissipated in the weeks after petitioner's arrest, and his examination established there were no legible prints on the gun.

Julie Cox, a forensic scientist at the Ohio Bureau of Criminal Identification and Investigation, found a partial DNA profile on the gun from "a mixture of at least three individuals." (Doc. 64 at 11). After comparing that profile with a sample of petitioner's DNA, Cox could draw no conclusions regarding whether petitioner contributed to the DNA on the gun.

The defense presented no evidence and stipulated that: 1) petitioner had previously been convicted of a crime punishable by more than one year of imprisonment; and 2) the gun—an Astra .22 caliber pistol—had traveled in interstate commerce.

Roughly two-and-a-half hours into their deliberations, the jury sent a note stating "we are not able to come to a unanimous decision based on the evidence presented." (Doc. 64 at 76). I gave the jury an *Allen* charge, and the jury returned a guilty verdict.

## B. Direct Appeal

Petitioner appealed, arguing, *inter alia,* that the evidence was insufficient to convict. The Sixth Circuit rejected petition-er's claims and affirmed. *U.S. v. Smith,* No. 10–4546 (6th Cir. Jan. 30, 2012). The United States Supreme Court denied certiorari. *Smith v. U.S.,* —— U.S. ——, 132 S.Ct. 2416, 182 L.Ed.2d 1049 (2012).

## C. Motion to Vacate

In July, 2012, petitioner filed a pro se motion to vacate his sentence, raising three claims: 1) trial counsel was ineffective for failing to interview witnesses, present an available defense, and permit petitioner to testify; 2) the prosecutor knowingly introduced perjured testimony; and 3) the prosecutor vouched for a witness's credibility during closing arguments.

Petitioner supported his ineffective assistance claim with affidavits from the witnesses whom counsel allegedly failed to interview: Antwaun Gibson, Devon Smith, and Daco Smith. Each of the affidavits is word-for-word identical to the others. And though the documents purport to be affidavits, none was properly notarized.

According to the affidavits, Gibson, Devon, and Daco had been at "a social gathering in front of 1547 Woodland Avenue" on September 20, 2009, "when police arrived." (Doc. 72–2 at 2; Doc. 72–3 at 2; Doc. 72–4 at 2). Each affiant stated that, although "[t]he officers told us to remain seated at the table where we were," petitioner said "he had to use the bathroom and entered the residence's front porch, where officers pursued him." (*Id.*).

The affiants also swore that "the front yard at 1547 Woodland Avenue ... functions as the gathering social area for the neighborhood," and that they had "seen scores of individuals enter the front porch of 1547 Woodland[.]" (*Id.*). Taylor also left the porch unlocked, such that it was "accessible to the public 24 hours a day, 7 days a week." (*Id.*).

The affiants also stated they "did not observe that [petitioner] had any kind of handgun" on the day of his arrest, nor was there "any bulge from [petitioner's] pocket." (*Id.*).

Finally, each affiant claimed petitioner's lawyer "never interviewed me [with respect to] these facts, despite my willingness to testify at [petitioner's] trial[.]" (*Id.*).

Petitioner also submitted his own affidavit stating that he was holding his cell phone and a set of keys when he was arrested on Taylor's porch.

After reviewing the motion, I dismissed the perjured testimony claim and reserved judgment on the propriety of the prosecutor's closing argument. I ordered an evidentiary hearing to resolve the ineffective assistance claim and appointed counsel to represent petitioner. (Doc. 76).

In February, 2013, counsel amended the § 2255 petition to state two additional arguments supporting the ineffective assistance claim: 1) counsel failed to seek suppression of the gun on Fourth Amendment grounds; and 2) counsel failed to object to the admission of Julie Cox's testimony.

### D. Evidentiary Hearing

#### 1. Trial Counsel

Trial counsel Vedo Robert Candiello testified his involvement in the case began when petitioner's wife, Mamie Smith, called him about a "problem in federal court." (Tr. 4).[2] Candiello quoted Mamie a $2,000 flat fee to represent petitioner, but he could not recall whether he decided on that figure during his first conversation with Mamie or after a preliminary investigation.

Candiello based his understanding of the events leading to petitioner's arrest entirely on police reports received in discovery and interviews with officers involved in the incident.

He acknowledged the police reports contained the names and addresses of three men—Daco Smith, Devon Smith, and Antwaun Gibson—also present during petitioner's arrest. But Candiello decided not interview them because: 1) "a couple of them had felony convictions" for drug offenses [3]; 2) police found each man in possession of marijuana; and 3) Candiello "assume[d] ... [their] rendition of the events was going to be the same" as that of the officers. (Tr. 21).

Thus, without knowing whether they had information favorable to his client, Candiello decided Daco, Devon, and Gibson "would not be beneficial witnesses[.]" (*Id.*).

At times, Candiello suggested his relatively low fee had limited the scope of his already abbreviated investigation. For example, when petitioner's current lawyer asked if Candiello had interviewed anyone living near the scene of petitioner's arrest, Candiello said, "No ... we don't go out and knock on doors ... If [petitioner] wanted to pay $10,000 I suppose that could have been done. But we tried to fit the defense within the budget we quoted." (Tr. 23).

Candiello gave little thought to moving to suppress the gun found on Taylor's porch. Counsel did not discuss a suppression motion with petitioner "because [he] didn't think it was appropriate" and he did not "believe there was anything to suppress." (Tr. 19). In counsel's view, "when [petitioner] started running" after officers

---

**2.** "Tr.__" refers to the transcript of the evidentiary hearing.

**3.** Candiello later agreed only one of the witnesses had a felony conviction; the others had only misdemeanor convictions.

ordered him to remain seated, petitioner "probably violated [a lawful] order of a police officer." (Tr. 20).

Candiello also claimed police had a warrant for petitioner's arrest, although he later acknowledged the police did not know about that warrant until after the arrest.

Regarding the trial, Candiello testified the defense theory was that the gun on Taylor's porch did not belong to petitioner.

According to Candiello, petitioner never told him that he was holding keys and a cell phone while on the porch. Moreover, Candiello claimed nothing in the discovery materials supported that claim. However, when petitioner's current lawyer showed Candiello a Lucas County Jail booking summary indicating petitioner had a cell phone and keys when he entered the jail, Candiello claimed the government never disclosed that document.

Candiello also testified he was surprised at trial by Officer LeRoux's testimony that he heard a thud after telling petitioner to drop the object in his hands. This was so, Candiello testified, because Officer LeRoux's report made no mention of a thud. Candiello agreed that, if petitioner had been holding a phone and keys while on the porch, that "would have provided an explanation for that thud[.]" (Tr. 47).

Candiello recalled that petitioner insisted DNA testing be conducted on the gun. In Candiello's view, the inconclusive test results would be favorable to the defense: he surmised the jury would want to hear about DNA testing, and the inconclusive results would preclude the government from arguing petitioner's DNA was on the gun.

Finally, Candiello and petitioner had "numerous conversations" about whether petitioner should testify. Candiello's general practice was to advise his clients "that it may not beho[o]ve you to take the witness stand because of several factors, one of those factors being you do not assume the responsibility of your actions if in fact you are found guilty." (Tr. 36). By this Candiello meant a client's decision to testify could, in the event of a conviction, preclude him from obtaining an acceptance-of-responsibility adjustment under United States Sentencing Guideline § 3E1.1.

Candiello believed petitioner would face "a second problem" if he testified: the prosecutor could impeach him with his prior felony convictions. (Tr. 36). Candiello also thought it undesirable for petitioner to deny owning the gun on Taylor's porch and then invoke the Fifth Amendment if asked about the drugs found nearby.

Given these concerns, Candiello advised petitioner not to testify. Candiello denied telling petitioner that, if he testified: 1) the prosecutor "would eat him alive" on cross-examination; and 2) the government would file a superseding indictment charging him with a drug offense. (Tr. 39).

### 2. Mamie Smith

Mamie Smith, petitioner's wife of three years, retained Candiello on her husband's behalf. When Mamie first contacted Candiello by telephone, he quoted her a $2,000 flat fee.[4]

Shortly thereafter, Mamie went to Candiello's office with her brother-in-law to discuss the case. While in counsel's office, petitioner called Mamie's cell phone, and Mamie turned on the speaker-phone function so petitioner could talk with everyone

---

**4.** I credit Mamie's testimony on this point, and I therefore find that when Candiello determined how much he would require to defend petitioner, he knew nothing about the case or its possible merits except the second-hand information Mamie may have relayed to him.

in the room. During this conversation, Mamie testified, Candiello asked about "the way the officer was saying that he heard a thump" after encountering petitioner on the porch. (Tr. 79).

Mamie frequently called Candiello while petitioner's case was pending, but he generally did not answer her calls. On the few occasions Mamie reached Candiello, she asked about the 911 call leading officers to 1547 Woodland, and whether he would interview the witnesses to petitioner's arrest. Candiello responded that he could not obtain any information about the 911 call and he was not interested in interviewing witnesses.

Sometime before trial, Candiello told Mamie the results of the DNA testing on the gun were inconclusive. When petitioner heard this news, he and Mamie agreed it "would be a good thing because they couldn't say if, you know [the gun] was or [ ] wasn't" in petitioner's hand. (Tr. 87).

Finally, Mamie testified petitioner had sent her the affidavits that Daco, Devon, and Gibson later signed. (Tr. 91).

### 3. Daco Smith

Petitioner's nephew Daco Smith testified the picnic table in the lot next to Terry Taylor's house was a neighborhood social hub. (Tr. 100). Taylor often allowed friends and neighbors gathered there to enter his house through the porch to grab a beer or use the restroom.

On September, 20, 2009, Daco was at the picnic table, "shooting dice for dollars" with petitioner, Devon, Gibson, and two other men. (Tr. 105). Daco testified that, moments before police arrived, petitioner stood up, said he needed to use the bathroom, and walked toward Taylor's home. When police arrived and told the men at the table to sit tight, petitioner was already on Taylor's porch.

This testimony contradicted Daco's affidavit stating petitioner was still at the picnic table when police arrived. According to Daco, that portion of his affidavit was inaccurate.

Daco was surprised to learn his uncle had been arrested for possessing a firearm, as he had not seen him with a gun that day. Daco acknowledged he himself has a felony drug conviction.

### 4. Petitioner

Petitioner testified that when he first spoke with Candiello by phone, he told Candiello "the only thing [the police] got from me is my cell phone and my house keys." (Tr. 133).

As his case moved toward trial, petitioner told Candiello he wanted to testify. However, Candiello said "I wouldn't recommend it . . . because the prosecutor will eat you alive." (Tr. 140). Candiello also failed to advise petitioner that if he testified, he could deny owning the gun and invoke the Fifth Amendment if asked whether the drugs were his.

Petitioner knew he had a right to testify, but he decided not to exercise it in light of Candiello's advice.

### 5. Disclosure of the Booking Summary

At the close of the hearing, petitioner's lawyer asked the government to respond to Candiello's claim that it failed to tender a copy of petitioner's Lucas County Jail booking summary. The government represented:

Yes, Judge. That's typically contained, very typically contained in every ATF prosecution, referral that we get and I made a copy of what was—what was in the file, to the best of the agent's recollection and that would have been includ-

ed ... So it's very likely [Candiello] did have access to [the booking summary]. (Tr. 154–155).

## Discussion

### A. Ineffective Assistance

Petitioner's primary claim is that Candiello was ineffective. To prevail, petitioner must "show both that his counsel provided deficient assistance and that there was prejudice as a result." *Harrington v. Richter*, —— U.S. ——, 131 S.Ct. 770, 787, 178 L.Ed.2d 624 (2011).

Counsel's performance is deficient if it falls below an objective standard of reasonableness. *Id.* "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Petitioner must "overcome the presumption that, under the circumstances, the challenged conduct might be considered sound trial strategy." *English v. Romanowski*, 602 F.3d 714, 726 (6th Cir.2010).

"With respect to prejudice, [petitioner] must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Harrington, supra,* —— U.S. at ——, 131 S.Ct. at 787. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland, supra,* 466 U.S. at 694, 104 S.Ct. 2052.

### 1. Performance

Petitioner alleges trial counsel performed deficiently in five ways, which I address in turn. I also consider those positive efforts Candiello took on petitioner's behalf, as "it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." *Harrington, supra,* —— U.S. at ——, 131 S.Ct. at 791.

### a. Failure to Interview Witnesses

Petitioner first faults counsel for not interviewing Daco, Devon, and Gibson, each of whom would have testified: 1) petitioner had left the picnic table and was walking toward Taylor's house before police arrived; 2) Taylor's porch was readily accessible to a large number of friends and neighbors socializing near his home; and 3) he did not see petitioner with a gun that day.

Had Candiello discovered this evidence and presented it at trial, petitioner argues, the jury would have had an innocent explanation for his apparent flight from police, as well as evidentiary support for the defense claim that the gun was not his and already on the porch before his arrest.

The government responds Candiello's conduct was reasonable because: 1) he determined the potential witnesses would not be favorable, given their criminal backgrounds; and 2) none of the witnesses saw what transpired on the porch.

"The focus in failure-to-investigate claims ... is the reasonableness of [counsel's] investigation (or lack thereof)." *English, supra,* 602 F.3d at 726.

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland, supra,* 466 U.S. at 690–691, 104 S.Ct. 2052. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690, 104 S.Ct. 2052. But "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations

on investigation." *Id.* at 691, 104 S.Ct. 2052.

■ Candiello offered three reasons for declining to interview Daco, Devon, and Gibson. First, he "assume[d] ... their rendition of the events was going to be the same as about six police officers" who were on the scene. (Tr. 21). Second, "a couple of [the witnesses] had felony convictions for drugs." (Tr. 16). Third, all of the witnesses "had marijuana on them at the time" of petitioner's arrest. (*Id.*).

These explanations notwithstanding, Candiello's failure to interview Daco, Devon, and Gibson fell below an objective standard of reasonableness. Rather than speak to the witnesses and learn what information they had, Candiello simply assumed their version of events would mirror that of the arresting officers. Candiello offered no basis for that assumption, let alone a reasonable one.

To be sure, Candiello properly recognized the witnesses' criminal backgrounds raised credibility issues. But without speaking to Daco, Devon, and Gibson, Candiello "was ill-equipped to assess [their] credibility or persuasiveness as witness[es], or to evaluate and weigh the risks and benefits of putting [them] on the stand." *Towns v. Smith*, 395 F.3d 251, 260 (6th Cir.2005). Indeed, Candiello had no idea what evidence the witnesses had, so he was in no position to make a reasonable judgment that the credibility problems outweighed the testimony they could have offered.

In failing even to speak with the non-police witnesses to petitioner's arrest, Candiello "was not functioning as the counsel guaranteed [to petitioner] by the Sixth Amendment." *Strickland, supra,* 466 U.S. at 687, 104 S.Ct. 2052.

### b. Failure to Present an Available Defense

Petitioner next faults Candiello for not presenting a viable theory of defense.

■ According to petitioner, the metallic object Officer LeRoux saw in his hand was, in fact, two innocuous objects: a set of keys and a cell phone. Petitioner also maintains the thud LeRoux heard was the sound of one or both of those objects hitting the porch. Despite telling Candiello about the keys and cell phone, petitioner claims, Candiello failed to introduce evidence supporting this line of defense.

The government argues Candiello could not have been ineffective on this score because petitioner never told Candiello he was holding those items.

The resolution of this claim depends on whose testimony I credit. Candiello denied petitioner told him that he was holding a cell phone and keys at the time of his arrest, while petitioner testified he told Candiello this during their first conversation.

On this issue, I credit Candiello over petitioner. First, Candiello conceded that, had he known petitioner was holding a phone and keys, that would have explained why Officer LeRoux heard a thud. This frank concession on Candiello's part was a notable break from much of his testimony, which was often defensive, dismissive, and even evasive (such as when he refused to answer questions he deemed irrelevant).

Accordingly, had petitioner told Candiello about the keys and cell phone, it would have been more in keeping with Candiello's overall testimony to evade questions on this subject or equivocate on the importance of whether petitioner had an innocuous object in his hands. Because Candiello did the opposite, I am inclined to believe petitioner never told him about holding the cell phone and keys.

Second, Mamie's testimony that she, petitioner, and Candiello discussed the thud during their first phone conversation cannot be true. None of the police reports mentioned that Officer LeRoux heard a thud, so the defense did not know of this detail until trial. Thus, Candiello would have had no reason during that first telephone call to inquire about the thud, just as petitioner would have had no reason to offer an explanation for it.

Third, neither petitioner nor Mamie testified how Candiello responded when he allegedly learned petitioner was holding a cell phone and keys. I find this omission significant, as petitioner and Mamie described Candiello's responses when asked to pursue other lines of defense (e.g., when Candiello said he was uninterested in interviewing witness and unable to obtain records about the 911 call).

For these reasons, I find that petitioner never told Candiello he was holding a cell phone and keys when he was arrested. Thus, Candiello was not deficient for failing to introduce evidence supporting that theory.

Anticipating I might reject his testimony, petitioner argues Candiello could have pursued this defense because he had access to the booking summary indicating petitioner had a cell phone and keys when he entered the jail.

Initially, I agree Candiello had access to the booking summary. In light of the government's representation about the discovery materials it disclosed, I reject Candiello's claim that the booking summary was not tendered.

However, the alleged significance of the keys and cell phone is not obvious from that document. All the booking summary shows is that those objects were among petitioner's possessions when he entered the jail; it does not say, for example, that

officers found those items on the porch, where petitioner claims he dropped them. *Cf. Sims v. Livesay,* 970 F.2d 1575, 1580 (6th Cir.1992) (even though petitioner never told counsel about significance of certain evidence to his self-defense claim, counsel performed deficiently in failing to use forensic report establishing that same evidence had undeniable significance to petitioner's claim of self-defense).

Moreover, in constructing the defense, Candiello was entitled to rely on his conversations with petitioner about what transpired on the porch. Because petitioner never told Candiello about the keys and cell phone, he was not deficient in failing to introduce evidence supporting this theory.

### c. Advice Regarding Petitioner's Right to Testify

■ Petitioner also asserts Candiello was ineffective for misadvising him about the consequences of testifying. According to petitioner, Candiello said testifying would make him ineligible for an acceptance-of-responsibility adjustment under Sentencing Guideline § 3E1.1.

The Guidelines provide a two-level adjustment for a defendant who "clearly demonstrates the acceptance of responsibility for his offense[.]" U.S.S.G. § 3E 1.1. Although most defendants who receive this adjustment plead guilty, some defendants who go to trial may qualify for it:

> This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises

his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.,* to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). U.S.S.G. § 3E1.1, comment (n.2).

Candiello's usual practice was to advise his clients that testifying may imperil their eligibility for the adjustment. Asked whether going to trial would automatically bar a defendant from obtaining the adjustment, Candiello said, "[I]t depends." (Tr. 43). Candiello did not say whether he clarified for petitioner whether his decision to go to trial would preclude the adjustment.

Based on Candiello's general practice and his failure to provide a clear answer on this issue, I conclude he advised petitioner that testifying would preclude him from obtaining the acceptance-of-responsibility adjustment. *Cf. Williams v. Lemmon,* 557 F.3d 534, 540 (7th Cir.2009) ("A lawyer's description of his normal practice allows a[ ] court to conclude that he acted in accord with that practice. (This is a routine inference, in tort law as well as post-conviction review.)"). And I conclude Candiello's advice was unreasonable.

As Candiello himself testified, petitioner's defense revolved around denying the gun found on Taylor's porch belonged to him. This was a clear "den[ial of] the essential factual elements of guilt," U.S.S.G. § 3E1.1, that precluded petitioner from an acceptance-of-responsibility adjustment, regardless of whether he testified.

Moreover, no reasonable attorney could conclude the adjustment was available in petitioner's case. The Sixth Circuit has repeatedly found the adjustment unavailable in cases like this one, where a defendant contests guilt on one or more elements of the offense. *See, e.g., U.S. v. Angel,* 355 F.3d 462, 477 (6th Cir.2004); *U.S. v. Pacheco,* 466 Fed.Appx. 517, 526 (6th Cir.2012) (defendant who admitted committing robberies but denied using intimidation to accomplish robberies was ineligible for acceptance-of-responsibility adjustment).

For these reasons, Candiello performed deficiently in advising petitioner that he would be ineligible for the adjustment if he testified: the decision to go to trial had already taken that adjustment off the table.[5] In so misadvising petitioner, Candiello deprived him of the right to make a knowing and voluntary decision whether to testify—a decision that belonged to petitioner alone. *Blackburn v. Foltz,* 828 F.2d 1177, 1182 (6th Cir.1987) (counsel's incorrect advice about consequences of testifying denied "a meaningful opportunity to decide whether to testify").

#### d. Failure to Litigate Fourth Amendment Claim

Petitioner further contends Candiello performed deficiently in failing to seek suppression of the gun on Fourth Amendment grounds.

Petitioner cites TPD records showing that, at 4:19 p.m. on September 20, 2009, a caller complained to police "about 13 males rolling dice [and] smoking weed . . . in the open field right in front of" 1533 Woodland

---

**5.** This does not mean that competent counsel will ignore the additional risks a testifying defendant runs by taking the stand in his own defense. If a judge concludes that the defendant testified falsely, such conclusion can impact the sentence, without regard to the lack of acceptance-of-responsibility credit. But here, Candiello did not make clear to petitioner that his decision to proceed to trial deprived him of that credit, so that, if he testified truthfully in his own defense, he ran no additional risk as to sentencing.

Avenue. (Doc. 91–2 at 1). The records also establish officers did not arrive on the scene until nearly an hour late, and that they responded, not to 1533 Woodland, but to 1547 Woodland, which was several lots to the west. Finally, the records indicate the caller did not provide the suspects' race, age, height, or clothing.

In light of these records, petitioner argues the police had neither reasonable suspicion to detain nor probable cause to arrest him for illegal gambling. He alleges any reasonable attorney would have obtained the TPD records and used them in a motion to suppress the gun as fruit of an illegal seizure.

In Candiello's view, there was nothing to suppress because petitioner "probably violated [a lawful] order of a police officer" when he left the table after being ordered not to move. (Tr. 19–20). From this testimony it appears Candiello assumed the police action was justified because: 1) police acted lawfully in attempting to seize petitioner on suspicion of gambling; and 2) his flight created additional grounds to detain him.

Had Candiello sought out the police records just discussed, he would have learned: 1) the complaint came in nearly one hour before police responded; 2) police responded to the wrong address; 3) the complaint mentioned thirteen males, as opposed to the four males the officers mention in their reports; and 4) the complainant failed to provide any physical description of the alleged gambling suspects.

Rather than make an informed decision whether to investigate the suppression issue further, Candiello assumed—again,

with no reasonable basis—that police were justified in attempting to seize his client at the picnic table, and petitioner's ensuing flight provided further grounds to detain him.

However, even a minimal investigation into this issue would have refuted those assumption. Far from there being nothing to suppress, the police records suggested, at the very least, that the officers lacked any basis to attempt to detain petitioner at the table, even if dice were in plain view.[6]

However, as with other facets of his work on petitioner's case, Candiello made unreasonable assumptions about the facts and law, thereby abandoning, without due consideration or information, the possibility of excluding the only evidence in the case that really mattered. Win that motion, and petitioner would have gone home, instead of to prison. Under these circumstances, it was incumbent on counsel, were he to meet his Sixth Amendment obligations to his client, to at least investigate and make a reasoned assessment of the possibility of suppression.

### e. DNA Evidence

■ Finally, petitioner challenges Candiello's handling of the government's evidence showing that DNA testing on the gun was inconclusive. Petitioner argues Candiello should have: 1) objected on relevance grounds to the admissibility of the DNA evidence; and 2) cross-examined Julie Cox about "the complete lack of statistical analysis" supporting her conclusions. (Doc. 91 at 34).

■ An ineffective assistance claim based on counsel's failure to object will fail

---

**6.** Are dice in view on a late Summer afternoon enough to give rise to reasonable suspicion that gambling is or has occurred, where the only other indication about gambling in the vicinity involved more people at a different location an hour earlier? For all the

officers knew, one of the persons present had put them on the table shortly before the officers arrived, and they otherwise were untouched and unused for any unlawful purpose.

if the decision not to object was reasonable. *Hodge v. Hurley*, 426 F.3d 368, 385–386 (6th Cir.2005).

Candiello supposed the jury would want to hear about DNA testing, and he believed the absence of petitioner's DNA on the gun would be favorable. For these reasons—and because petitioner was insistent that DNA testing be done on the gun—Candiello did not object to Cox's testimony.

Candiello's allowing the jury to hear the DNA evidence fell well within the wide range of reasonable professional judgment and assistance. Candiello's hunch the jury would want to hear something about DNA testing accords with a common view among legal professionals. *See, e.g., U.S. v. Fields*, 483 F.3d 313, 355 n. 13 (5th Cir.2007) (claim that television show *CSI* causes jurors to demand scientific evidence is "plausible," though not "proven empirically").

Moreover, Candiello's view of the evidence was certainly defensible, as the inconsistent test results arguably undermined the government's claim that petitioner possessed the gun.[7]

Petitioner also suggests Candiello's cross-examination of Cox was lacking because it comprised only eleven questions and did not address the lack of statistical analyses supporting Cox's conclusion.

Rather than delve into the issue of statistical analyses, Candiello elected to underscore the fact that Cox could draw no firm conclusions about whether petitioner's DNA was on the gun. This was not the only way to respond to Cox's testimony, but it was a reasonable course of action nonetheless. Furthermore, petitioner has not adequately explained how the lack of statistical analysis undermines Cox's test results, which were inconclusive as to the source of the DNA.

Its brevity notwithstanding, Candiello effectively highlighted the absence of scientific evidence linking the gun to petitioner.

### f. Summary: Reasonableness of Representation

In sum, Candiello's performance fell below an objective standard of reasonableness.

To be sure, Candiello took some positive steps on petitioner's behalf. For example, Candiello: 1) interviewed the arresting officers before trial; 2) moved *in limine* to exclude the drug evidence; 3) timely objected to an officer's testimony that the area around 1547 Woodland was known for heavy drug-trafficking; and 4) successfully objected to an error in the pre-sentencing report.

Nevertheless, by failing to speak with other witnesses to petitioner's arrest, properly to inform petitioner about the consequences of testifying, and not pressing the suppression issue, Candiello was not performing as the counsel guaranteed petitioner by the Sixth Amendment. Therefore, Candiello is no longer entitled to the presumption of competence.

### 2. Prejudice

Candiello's lapses occurred primarily at the pre-trial investigative, assessment, and motion stages. These errors essentially cut the legs out from under the defense

---

**7.** It appears fair to ask, and perhaps conclude, that testimony by the petitioner about the gun being on the porch before his arrest would have heightened the impact of the inconclusive test results, and *vice-versa*. But, as noted, Candiello misunderstood the law about acceptance-of-responsibility departures, and his misunderstanding kept petitioner from making a knowing and informed decision whether to exercise his right to provide that evidence.

before the trial even began and denied petitioner the opportunity to present a plausible, coherent account of the events occurring before his arrest. The errors were all the more significant, given the lack of compelling evidence against petitioner. *Strickland, supra,* 466 U.S. at 696, 104 S.Ct. 2052 ("a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support").

■ Because there is a reasonable probability that, but for Candiello's errors, the result of petitioner's trial would have been different, I conclude petitioner has also satisfied *Strickland*'s prejudice prong.

First, three witnesses were available to testify that Terry Taylor's porch was an active neighborhood social hub accessible at all hours of the day and night. As Daco Smith explained, Taylor allowed friends and neighbors socializing at the picnic table to use his bathroom or grab a beer from the ice box. As a rule, these neighbors entered the home via Taylor's porch, which was always unlocked.

This testimony would have added much force to the defense's claim that the gun Officer Bailey recovered was on the porch before petitioner was arrested. Although Candiello pressed this theory during his closing argument, he could point to no concrete evidence supporting it. Predictably, the prosecutor pounced on that omission in his rebuttal, arguing that "what [petitioner] wants you to believe, what Mr. Candiello wants you to believe is this is the biggest coincidence of all time that [petitioner] happened to be on the wrong porch at the wrong time." (Doc. 64 at 67).

Without Daco Smith and the other witnesses' testimony, there was no reason for the jury to think there would be a gun on Taylor's porch. But the uncalled witnesses could have established that Taylor's porch was, in essence, an unsupervised location accessed by, and accessible to, large numbers of people. The testimony also would have complemented the trial evidence showing Taylor's porch to be cluttered with furniture and boxes.

While this testimony does not definitively establish there was a gun on Taylor's porch before petitioner's arrest, it explains why there may have been a gun there and why it could have gone unnoticed.

Second, Candiello's misadvice about the consequences of testifying not only deprived petitioner of his right to make a knowing, voluntary decision whether to testify. *Blackburn, supra,* 828 F.2d at 1182. It also deprived the jury of additional evidence reinforcing petitioner's "not mine" defense: his testimony was he was holding his cell phone and keys while on the porch.

In light of all the evidence, a reasonable jury would have been warranted in crediting that testimony. To begin, Officer LeRoux, who was critical in linking petitioner to the gun, admitted he could not be sure whether, in fact, the metallic object he saw in petitioner's hand was a gun. Thus, had the jury known petitioner was holding two objects with a metallic tint, it could have inferred that he was not holding a gun. This is especially true given: 1) the absence of petitioner's DNA on the gun; 2) Daco Smith's testimony he did not see petitioner with a gun on the day of his arrest; and 3) the possibility petitioner attempted to elude police because of his outstanding warrant.[8]

---

8. Petitioner also argues he and the other witnesses would have testified he was already on the porch when police arrived. However, as discussed above, this testimony, which contradicts petitioner's and the other witnesses' affidavits, is simply not credible. Moreover,

In addition, petitioner's proposed testimony is bolstered by the jail booking summary indicating petitioner possessed a cell phone and keys when entering the jail.

There was no trial testimony respecting where the officers recovered these objects, and the TPD records, too, are silent. This may be because, as the government argues, the phone and keys were merely personal possessions the officers found on petitioner's person. But it is equally plausible the officers discovered the items on the porch and, because the items bore no obvious pertinence to the investigation, did not mention them in their reports. At the hearing, however, the government introduced no evidence countering petitioner's proposed testimony the officers recovered these items on the porch.[9]

Finally, the government's evidence, while sufficient to convict, was far from overwhelming—a fact underscored by the jury's note reporting its inability to reach a unanimous verdict and my issuing an *Allen* charge. *U.S. v. Woodard,* 699 F.3d 1188, 1199 (10th Cir.2012) (fact that "jury deliberated for eight hours and reached a verdict only after receiving an *Allen* charge [ ] further convinc[es] us that the error was not harmless beyond a doubt"); *U.S. v. Jean–Baptiste,* 166 F.3d 102, 109 (2d Cir. 1999) ("The fact that a jury was initially deadlocked and reached a verdict only after receiving an *Allen* charge may support an inference that the case was close.").

To summarize, Candiello's unprofessional lapses at the pretrial stages prejudiced the defense. The defense had a plausible, coherent narrative to oppose the government's. Candiello introduced part of it at trial—petitioner fled police for reasons unrelated to his defense, and the government had failed to link petitioner to the gun via eyewitness and DNA evidence—but his unreasonable assumptions and incorrect advice prevented the jury from hearing the complete story. That these lapses occurred in such a close case that an *Allen* charge was necessary entirely undermines my "confidence in the outcome." *Strickland, supra,* 466 U.S. at 694, 104 S.Ct. 2052.

Thus, I conclude a new trial is warranted on the basis of these errors alone.

### 3. Motion to Suppress

To show prejudice based on Candiello's failure to seek suppression of the gun, petitioner must "prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Ray v. U.S.,* 721 F.3d 758, 762 (6th Cir.2013).

Here, there is no question the result of trial would have been different had Candiello successfully suppressed the gun: the case would not have gone to trial without the gun in evidence. The closer question

---

with the weight of the evidence putting petitioner at the picnic table when the officers arrived, the flight instruction, to which, according to petitioner, Candiello should have objected, was entirely proper.

**9.** To bolster its attack on the credibility of petitioner's testimony, the government asserts petitioner failed to "inform his appellate counsel Spiros Cocoves of this possible defense during his appeal." (Doc. 92 at 15). However, the government cites no portion of the record to support its representation of

what topics petitioner and appellate counsel discussed. Moreover, even if there were evidence to support the government's claim, it would not be particularly probative. The Supreme Court has emphasized that a § 2255 is the preferred vehicle for raising *Strickland* claims, particularly when, as is the case here, the factual basis of the claim does not appear in the direct appeal record. *Massaro v. U.S.,* 538 U.S. 500, 504–505, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003).

is whether petitioner's Fourth Amendment claim is meritorious.

■ Petitioner contends police lacked either reasonable suspicion to detain him or probable cause to arrest him. He relies on the records showing: 1) police did not respond to the gambling complaint until nearly an hour after the complaint came in; 2) police did not have any way to identify the suspects, given the caller's failure to provide identifying details; and 3) police responded to the wrong address— 1547 Woodland, rather than 1533 Woodland, the reported locus of the illegal gaming. Moreover, the officers saw only four, not thirteen, people on the scene, and the only putative indicia of criminal misconduct was a pair of dice on the table. They saw no one using the dice, and could have had no idea whether anyone had been doing so.

The government responds the Fourth Amendment claim is meritless because, regardless of the gambling complaint, police had probable cause to detain petitioner for violating a provision of the Toledo Municipal Code requiring property owners keep sidewalks free of debris. Because the picnic table was allegedly on the sidewalk, the government argues, police had probable cause to seize petitioner. But the government has not proved that such an ordinance exists.[10]

I agree with petitioner that when officers instructed him and his companions to remain seated at the picnic table, they lacked reasonable suspicion to believe they were involved in, or had engaged in, any illegal conduct.

I conclude, accordingly, that the officers did not have reasonable grounds to suspect petitioner of unlawful conduct—and thus no basis to restrain his liberty by ordering him not to move. That being so, petitioner was entirely free—for whatever reason— to ignore the officers and leave the scene. *Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) ("[W]hen an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business.").

However, no seizure occurred when, despite the order not to move, petitioner felt free to disregard the order and departed. *Brendlin v. California*, 551 U.S. 249, 254, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007) ("there is no seizure without actual submission; otherwise, there is at most an attempted seizure, as far as the Fourth Amendment is concerned"). Just as the petitioner could walk away, so the officer could follow him without engaging in a seizure. *Cf. California v. Hodari D.*, 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) (concept of "seizure" does not "remotely apply ... to the prospect of a policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee").[11]

■ Rather, the seizure occurred only after Officer Leroux, on entering the porch immediately after petitioner, saw a metallic object in petitioners hand and drew his gun while ordering petitioner to drop whatever he was holding. The officer was justified under the Fourth Amendment in

---

10. As petitioner points out, the ordinance on which the government relies comes not from Toledo, Ohio, but Toledo, Oregon. Thus there is no merit whatsoever to the government's primary argument in opposition to the Fourth Amendment claim.

11. There is a dispute of fact as to whether the petitioner walked away or, at some point, started to run. No resolution of this dispute is necessary, even though headlong flight is relevant to whether an officer has reasonable suspicion to detain an individual. *U.S. v. Johnson*, 620 F.3d 685, 694 (6th Cir.2010).

taking reasonable steps to control the situation, ascertain what the circumstances were, and thereby avoid a reasonably apprehended risk of danger to himself and others. *See, e.g., U.S. v. Pearce,* 531 F.3d 374, 382 (6th Cir.2008) ("in light of the totality of the circumstances, Officer [Leroux] had an objectively reasonable suspicion that his safety or that of others was in danger.") Thus, Officer Leroux did not unreasonably seize petitioner when ordering him at gunpoint to drop the object in his hands.

I conclude, accordingly, that petitioner cannot show prejudice from Candiello's's failure to have considered, investigated, and followed up on the possibility of suppression.

### B. Conflict of Interest

Petitioner also contends he was denied his Sixth Amendment right "to representation that is free from conflicts of interest." *Wood v. Georgia,* 450 U.S. 261, 271, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981).[12]

To establish that counsel had a conflict of interest, petitioner must show: 1) "counsel actively represented conflicting interests"; and 2) the conflict "adversely affected his lawyer's performance." *Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). An adverse effect exists when counsel makes "a choice between possible alternative courses of action that impermissibly favor[s] an interest in competition with those of the client." *Washington v. Lampert,* 422 F.3d 864, 872 (9th Cir.2005).

▪ Petitioner contends Candiello's flat-fee contract gave him a "personal interest [in] incur[ring] as little expense as possible in this case so the entire $2,000.00 would go toward his fee." (Doc. 91 at 17).

In arguing this claim, petitioner relies on the following portion of Candiello's testimony:

Q: Mr. Candiello, did you interview any witnesses or potential witnesses on the street upon which this arrest occurred to see if anyone else had information that would be helpful or relevant to [petitioner's] defense?

A: No, because no other names were given to me.

Q: No other names were given to you?

A: That's correct.

Q: Is that common for you not to do interviews or field work unless information is given to you?

A: It's not common but we don't go out and knock on doors to ask some people to serve something [*sic* ].

Q: Mr. Candiello owe [*sic* ]?

A: If [petitioner] wanted to pay $10,000 I suppose that could have been done. But we tried to fit the defense within the budget we quoted.

(Tr. 23).

Having observed Candiello during this exchange, and having reviewed his remarks in the broader context of his entire testimony, I find only one reasonable interpretation of his comments: Candiello would provide petitioner whatever defense $2,000 could buy, and nothing more. Candiello was thus torn between his obligation to represent petitioner zealously and the financial limits on his capacity to investigate the case.

That said, petitioner has not proved the conflict adversely affected Candiello's performance. Petitioner relies exclusively on the testimony that, had petitioner paid $10,000, Candiello could have traveled to Woodland Avenue and investigated whether anyone living near Terry Taylor's home

12. The government's post-hearing brief does not address the conflict-of-interest claim.

had favorable evidence. Petitioner contends that, as a factual matter, Candiello cut short his search for witnesses because petitioner had not paid a larger fee.

This argument fails for two reasons. First, petitioner has not shown that canvassing Woodland Avenue for witnesses was an objectively reasonable trial strategy that any attorney representing petitioner would have adopted. *See, e.g., Noe v. U.S.,* 601 F.3d 784, 790 (8th Cir.2010) (to prove adverse effect, defendant must show, *inter alia,* that "alternative strategy was objectively reasonable under the facts of the case"); *U.S. v. Stitt,* 552 F.3d 345, 351 n. 4 (4th Cir.2008) (same).

Although canvassing Woodland Avenue for potential witnesses was an available option, it was not an investigative tack any reasonable attorney would have followed.

On the contrary, the police reports described a fairly isolated incident: police responded to a gambling and drug complaint and ordered the suspects to remain still, and petitioner disregarded the order, fled onto the porch, and was arrested after a struggle. The reports listed the names and contact information of three men who observed most of these events. And, given the narrow confines of Taylor's porch, where the critical encounter between petitioner and LeRoux occurred, it is not readily apparent that other witnesses would have relevant information about these events.

Given these considerations, a reasonable attorney could have forgone an expansive search for witnesses on Woodland Avenue in favor of a more limited investigation focused, at least initially, on Devon, Daco, and Gibson.

Second, petitioner has not shown that the conflict actually caused Candiello to limit his investigation.

Unlike petitioner, I did not understand Candiello to have testified he wanted to go door-to-door on Woodland Avenue looking for witnesses, but could not do so because of limited resources. Rather, I took Candiello's testimony as a hyperbolic (and perhaps dismissive) response to a question about why he had not engaged in a fruitless exercise—i.e., canvassing Woodland Avenue for additional witnesses.

Indeed, Candiello bypassed the most obvious witnesses, not because of financial concerns, but because of a professionally unreasonable judgment that speaking with them was unnecessary. Given that finding, it is implausible to think Candiello wanted to seek out additional witnesses who were less likely to have relevant information, but did not do so because petitioner paid only $2,000.

Finally, I find Candiello's remarks to be extremely troubling. In the future, attorneys appearing before me should know I am always willing to entertain requests for funds needed to conduct appropriate investigations.

For all of these reasons, I reject petitioner's conflict-of-interest claim.

### C. Prosecutorial Misconduct

■ Petitioner's last claim is that the prosecutor engaged in misconduct when, during closing argument, he vouched for the credibility of Officer LeRoux's account of the events precipitating petitioner's arrest.

The government contends petitioner procedurally defaulted this claim by failing to raise it on direct appeal.

Petitioner's reply brief does not address the government's procedural default argument.

"It is well-established that a § 2255 motion is not a substitute for a direct appeal." *Ray, supra,* 721 F.3d at 761. "[C]laims that could have been raised on direct ap-

peal, but were not, will not be entertained via a motion under § 2255 unless the petitioner shows: (1) cause and prejudice to excuse his failure to raise the claims previously; or (2) that he is actually innocent of the crime." *Id.*

The appellate record contains the factual basis for petitioner's claim, and there appears to be no reason why petitioner could not have raised this claim on direct appeal. Thus, the claim is procedurally defaulted. Because petitioner has not argued that either exception applies, I need not address this claim any further.

### Conclusion

For the reasons set forth above, it is

ORDERED THAT:

1. Petitioner's motion to vacate under 28 U.S.C. § 2255 (Doc. 72) be, and the same hereby is granted on his claim that trial counsel was ineffective. In all other respects, the motion is denied.

2. Petitioner's judgment and conviction be, and the same hereby are vacated.

3. Petitioner is granted a new trial on the felon-in-possession charge.

The U.S. Marshals Service shall cause the petitioner to be brought forthwith before this Court for further proceedings, to consider whether to release the petitioner from custody pending his new trial (or, if the government appeals this order, pending appeal), and for such other proceedings as may be appropriate.

The Clerk shall, on notice of the petitioner's arrival within this District, set a status/scheduling and detention conference.

So ordered.